JEFFREY POOLE ET AL. *v.* CITY OF
WATERBURY ET AL.
(SC 16856)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 14—officially released September 30, 2003

*Brian Clemow*, with whom were *Gary S. Starr* and *Sheila A. Huddleston*, for the appellants (named defendant et al.).

*Linda L. Morkan*, with whom were *Richard F. Vitarelli* and *Stephen W. Aronson*, for the appellants (defendant Waterbury financial planning and assistance board et al.).

*Francis J. Grady*, with whom was *Dana B. Lee*, for the appellees (plaintiffs).

*Eric R. Brown* filed separate briefs for the Waterbury Retired Educators' Association and the Connecticut Council of Police Unions, Council 15, AFSCME, AFL-CIO, as amici curiae.

*Opinion*

KATZ, J. The dispositive issue in this appeal[1] is whether the trial court properly concluded that the

---

[1] The defendant Waterbury financial planning and assistance board and its members who were named as defendants; see footnote 3 of this opinion; appealed from the trial court's judgment to the Appellate Court. Thereafter, pursuant to General Statutes § 52-265a, Chief Justice Sullivan granted the petition for certification to appeal filed by the other defendants, the city of Waterbury and the Waterbury retirement board and the individual members named as defendants; see footnote 3 of this opinion; and ordered that the appeal pending in the Appellate Court be transferred to this court and consolidated with the certified appeal.

plaintiffs, a group of 114 retired firefighters and widows of retired firefighters[2] for the named defendant, the city of Waterbury (city), have a vested right to the specific medical benefits prescribed under the collective bargaining agreement in effect at the time that the firefighters retired. The defendants[3] claim that the trial court improperly: (1) construed the collective bargaining agreements as providing the plaintiffs with a vested lifetime right to the specific medical benefits they had at the time of the retirees' retirement; (2) concluded that No. 01-1 of the 2001 Special Acts (S.A. 01-1)[4] did not

[2] Because the benefits accruing to the widows of the retired firefighters are derivative of the benefits to which their husbands would have been entitled, we use the term plaintiffs to refer to both the retirees and the widows of the retirees. Where appropriate, we refer herein to the retired firefighters as the "retirees."

[3] The defendants are: the city; the Waterbury financial planning and assistance board (oversight board), oversight board chairman Marc S. Ryan and oversight board members Denise L. Nappier, Michael J. Jarjura, Jack Cronan, Ralph H. Carpinella, George G. Hajjar, Sr., and James B. Mullen, Jr.; the Waterbury retirement board, retirement board chairman and city financial director Richard A. Russo and retirement board members Robert Lyons, Patrick Cooney, Stephen Giacomi, J. Paul Vance, Jr., and Ronald E. Brodeur, Sr.; and Palma Brustat, the city's benefits administrator.

[4] Number 01-1 of the 2001 Special Acts provides in relevant part: "Section 1. It is hereby found and declared that a financial emergency exists with regard to the city of Waterbury, that the continued existence of this financial emergency is detrimental to the general welfare of the city and the state, that the city's continued ability to borrow in the public credit markets and the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and an essential public purpose to provide in this act for the financing of deficits resulting from the city's operations, the imposition of financial management controls and the creation of the Waterbury Financial Planning and Assistance Board to review the financial affairs of the city of Waterbury, all in order to achieve or maintain access to public credit markets, to fund the city's accumulated deficits and to restore financial stability to the city of Waterbury.

* * *

"Sec. 10. (a) There is hereby created the Waterbury Financial Planning and Assistance Board which shall be in the Office of Policy and Management for administrative purposes only, which board shall be comprised of the following members: The Secretary of the Office of Policy and Management or the secretary's designee, who shall serve as the chairman of the board

## authorize the defendant oversight board; see footnote 3

and shall preside over all meetings of the board; the State Treasurer or the treasurer's designee; the mayor; four members appointed by the Governor, one of whom shall be a resident of the city of Waterbury, one of whom shall be affiliated with a business located in the city, one of whom shall have an expertise in finance and one of whom shall be the chief executive officer of a bargaining unit representing employees of the city who is jointly recommended by a majority of the chief executive officers of such units provided such recommendation shall be made not later than seven days after the effective date of this act. . . .

"Sec. 11. (a) In carrying out the purposes of this act, the board shall have the following powers, duties and functions . . .

"(5) With respect to labor contracts in or subject to binding arbitration, serve as the binding arbitration panel. The board shall have the power to impose binding arbitration upon the parties any time after the seventy-fifth day following the commencement of negotiations. If, upon the effective date of this act, the parties are in binding arbitration, the board shall immediately replace any established binding arbitration panel. The time limits in the applicable provisions of the general statutes or any public or special acts governing binding arbitration shall be reduced by one-half. The board shall not be limited to consideration and inclusion in the collective bargaining agreement of the last best offers or the matters raised by or negotiated by the parties;

"(6) Review and approve or disapprove any contract and any renewal, extension or modification thereof not covered by collective bargaining contemplating the expenditure in either the current or any future fiscal year of more than fifty thousand dollars and shall have the power to set aside any contracts which have not been authorized in accordance with the requirements of any state or local law . . . .

"(b) The board may . . .

"(7) Review any existing contract of the city, not covered by collective bargaining, to determine if such contract is in the best interest of the city and shall have the power to set aside such contract provided there is no significant penalty to the city as a result of such action . . . .

\* \* \*

"Sec. 20. This act is intended to authorize the city to fund its accumulated deficits, to establish a board to review the financial affairs of the city in order to maintain access to the public markets and to restore financial stability to the city, and shall be liberally construed to accomplish its intent. The provisions of this act shall supersede any provisions of the general statutes, any public or special act and the charter of the city enacted prior to or subsequent to this act other than a subsequent act of the General Assembly which specifically states that it supersedes this act except that, unless expressly provided in this act, nothing in this act shall affect the provisions of the Municipal Employees Relations Act, sections 7-467 to 7-477, inclusive, of the general statutes, or the provisions of the Teacher

of this opinion; to modify the plan; and (3) granted permanent injunctive relief in the form of reinstatement of the specific medical benefits in light of the city's financial crisis. We conclude that, although the plaintiffs have a vested right to medical benefits generally, they do not have a vested right to the specific benefits prescribed in the collective bargaining agreement in effect at the time of the retirees' retirement. Accordingly, we reverse the judgment of the trial court.

The record reveals the following facts and procedural history. For some time prior to 1986, the city provided medical benefits to retired city firefighters, but those benefits were not included expressly in the city's collective bargaining agreements. Beginning in 1986, the city and the Waterbury Fire Fighters Association, Local 1339 (union), a labor union in which each of the retirees was a member until his retirement, negotiated a series of collective bargaining agreements, each of which included a provision for retirees' medical benefits, effective: July 1, 1986, through June 30, 1989 (1986 agreement); July 1, 1989, through June 30, 1992 (1989 agreement); July 1, 1992, through June 30, 1995 (1992 agreement); and July 1, 1995, through June 30, 1999 (1995 agreement).[5] The 1986 agreement provided, in article XXXIII, § 16, that the city "shall continue in full force and effect the benefits for each retiree and each employee who retires or dies after July 1, 1986, his spouse, and each eligible dependent of such retiree or

Negotiation Act, sections 10-153a to 10-153o, inclusive of the general statutes. . . ."

[5] Neither the plaintiffs' complaint nor the trial court's memorandum of decision separates the plaintiffs into groups according to the effective date of the collective bargaining agreement under which each retiree retired. It is clear, however, from affidavits in the record that some of the retirees retired under the 1995 agreement, and others retired under earlier agreements. Because the record does not distinguish between retirees by retirement period and the agreements are, in large measure, similar, we consider the plaintiffs' claim in light of all of the agreements.

employee . . . ." The provision thereafter set forth the scope of the benefits, a basic plan supplemented by various home and office, major medical and prescription drug riders (indemnity plan),[6] which was to be provided "at no cost to those eligible" pursuant to article XXXIII, § 16a, of the agreement.[7] The 1989, 1992 and 1995 agreements provided similar indemnity plans, but referred only to providing such benefits to employees who retired after the execution of the agreement, and not to those employees who already had retired. The 1995 agreement imposed two additional terms: (1) § 16 of article XXXIII provided that the prescribed "medical benefits for retirees . . . may be substituted for similar—but in no event, less—medical benefits if the City and the Coalition of City Unions agree on a modified insurance plan for City employees"; and (2) § 17 of that article mandated participation in medicare for retirees

---

[6] Prior to 1999, the agreements expressly referred to Blue Cross-Blue Shield as the health care provider. Currently, however, Anthem is the health care management company that administers the programs previously known under the name of Blue Cross-Blue Shield.

[7] Article XXXIII of the 1986 agreement, setting forth medical benefits for retirees, provided: "Section 16. Effective July 1, 1986, the City of Waterbury shall continue in full force and effect the benefits for each retiree and each employee who retires or dies after July 1, 1986, his spouse, and each eligible dependent of such retiree or employee as described as follows:

"(a) The Blue Cross semi-private room plan;

"(b) The Blue Cross maternity rider;

"(c) The Blue Shield (formerly Connecticut Medical Service) Basic Century 90 Plan ('basic' meaning that no supplemental or additional endorsements or riders are included);

"(d) The Major Medical Program currently in effect which provides essentially the following: each employee and each eligible dependent is entitled to maximum life coverage, per the provisions of the policy, in the amount of $1,000,000.00. The deductibles and restoration rights and other conditions are set forth in the Master Agreement with the Insurance Company;

"(e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider;

"(f) The Blue Cross-Blue Shield Home and Office Medical Care Rider (which presently has a $5 Deductible) known as the Century 96 Rider to the Century Contract.

"Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost, to those eligible."

who had attained the age of sixty-five, had received medical benefits under the agreement and were eligible for medicare, with the city providing supplemental insurance. At the expiration of the 1995 agreement in June of 1999, the city and the union had not yet agreed on terms for a successor agreement. After negotiations failed to result in a consensus, the matter was submitted for binding arbitration.

During the course of the negotiations between the city and the union, the state legislature determined that it had to take certain action because, as a result of many years of gross fiscal mismanagement, the city was in a state of financial crisis. See S.A. 01-1, § 1. Specifically, the city had underfunded its pensions for years and was paying its pension liabilities out of the city's general fund. In addition, the city had been paying health care benefits, the cost of which were rapidly rising, out of the city's general fund. As a result of these and other liabilities, the city's bond rating had been downgraded. The crisis threatened not only the city, but also the fiscal reputation of the state, which acts essentially as guarantor of certain of the city's obligations.

To address the crisis, the legislature enacted S.A. 01-1, effective upon its passage on March 9, 2001. See footnote 4 of this opinion. In accordance with the special act, the city was required to undertake certain fiscal and management controls. As a further measure, the legislature created the oversight board to ensure that order was restored to the city's finances. S.A. 01-1, §§ 10 and 11. The special act confers broad authority on the oversight board to take the necessary measures to accomplish this goal. S.A. 01-1, § 11. The oversight board's authority encompasses, inter alia, the power to set aside city contracts, under certain circumstances, and to serve as the arbitration panel with respect to

labor contracts subject to binding arbitration. S.A. 01-1, § 11 (a) (5) and (b) (7).

Pursuant to its authority, the oversight board acted as the arbitrator in the collective bargaining dispute between the city and the union. On December 14, 2001, the oversight board issued an arbitration award prescribing the city's obligations, effective retroactively from July 1, 1999, through June 30, 2004 (1999 agreement). Article XXXIII, § 16, of the 1999 agreement set forth the following terms regarding medical benefits: "Those employees who are participating in the City's medical insurance plan at the time of retirement . . . shall be eligible to participate in such medical insurance plan which the City provides to its active bargaining unit employees, as such plans may change pursuant to any successor collective bargaining agreement, subject to the same conditions as may exist at any time for such active employees." Under the 1999 agreement, active employees, and therefore retirees, received medical benefits pursuant to a managed care plan with a preferred provider organization, rather than the traditional indemnity plan provided under previous agreements. Additional changes under the 1999 agreement included, inter alia, a requirement of a small copayment for office and home visits.

On March 14, 2002, the plaintiffs filed in the Superior Court an application for prejudgment remedy, seeking temporarily to enjoin the defendants from altering the plaintiffs' existing medical benefits. The plaintiffs also filed the complaint in this action, seeking temporary and permanent injunctive relief, as well as damages, and alleging that the defendants' conduct constituted: (1) a breach of contract; (2) an ultra vires act; (3) a taking under the state and federal constitutions; and (4) an impairment of contract rights in violation of the federal constitution. Thereafter, the parties stipulated that the temporary injunction hearing also would serve

as the hearing on the plaintiffs' claim for permanent injunctive relief. At hearings on the matter, the court heard testimony from various city officials and several of the plaintiffs as to the city's prior practices with respect to the provision of specific medical benefits to retirees. The court also heard testimony from city officials regarding the city's financial crisis and the various measures the city had taken as a result, which affected the plaintiffs, other city employees and city residents generally.

On August 14, 2002, the trial court issued its memorandum of decision, concluding that the defendants had breached the plaintiffs' vested contractual right to the specific indemnity plan provided under the pre-1999 collective bargaining agreements. In its memorandum of decision, the trial court first examined the factual context in which the issues arose. It recognized the magnitude of the financial crisis facing the city and noted the oversight board's estimate of $2 million in savings resulting from the conversion of all of the city's retired employees to managed health care plans. The court concluded that "[t]he failure of the city to bring prudent cost controls to retiree health benefits will create serious difficulties for the city in enacting the types of conservative budgets mandated by [S.A.] 01-1." The court then noted certain differences in cost and availability of services and service providers between the managed care plan provided under the 1999 agreement and the indemnity plan provided under the pre-1999 agreements. The court concluded that, "[although] a managed health care plan is inherently less flexible than a traditional indemnity plan, it is by no means certain from the evidence that a given beneficiary will always fare worse under the new health care plan . . . ." Nonetheless, the court concluded that "[t]he plaintiffs here have succeeded in showing that there are significant differences between the traditional

indemnity plans currently provided to them and the proposed managed care plan. The court cannot conclude that the differences are trivial, even though the plaintiffs have not shown that over their life expectancy they will suffer a specific quantifiable loss."

The court next turned to the legal issues. It first determined that the question of whether the plaintiffs have a vested right to the specific medical benefits was governed by ordinary contract principles. Applying those principles, the court pointed to certain language in the pre-1999 agreements providing that the city " 'shall continue in full force and effect the benefits for each employee who retires or dies on or after the execution of this agreement.' " The court noted competing interpretations by the parties as to the meaning of that phrase, and then turned to examine certain extrinsic evidence, specifically, testimony related to the city's prior practice of continuing benefits for retirees beyond the expiration of the agreements. The court concluded that, "[t]he way the city and the current and former union membership jointly interpreted the provisions of these contracts for almost two decades clearly indicates the intent of the parties to create a vested right to the health benefits that each firefighter elected on retirement." The court rejected the defendants' contention that S.A. 01-1 empowered the oversight board to modify vested rights obtained under collective bargaining agreements.

With respect to the plaintiffs' remedies, the court concluded that the plaintiffs had demonstrated that injunctive relief was appropriate. The court further concluded that it was unclear whether any plaintiff yet had suffered a monetary loss and noted that it retained jurisdiction over the issue of damages should future damages be incurred. In light of its conclusion on the vesting issue, the trial court did not reach the other claims asserted by the plaintiffs. Accordingly, the court

issued an order enjoining the defendants from taking any action to terminate involuntarily any plaintiffs' indemnity plan benefits.

Thereafter, the parties submitted motions to correct the court's August 14, 2002 memorandum of decision. Specifically, they contended, inter alia, that the court's findings and order presupposed that the defendants had not yet converted the plaintiffs to the new health care plan, when the conversion had in fact been completed on or about April 1, 2002. The trial court issued a corrected memorandum of decision to amend the incorrect findings of fact and to order that the defendants "take all necessary steps to reinstate each plaintiff to the health care plan in which each plaintiff was enrolled prior to the involuntary conversion to the managed health care plan on or about April 1, 2002, unless the plaintiff requests not to be so reinstated."

The defendants also submitted an application for a stay of the permanent injunction, which the trial court denied. Thereafter, the defendants filed with this court a motion for an emergency temporary stay and a motion for review of the trial court's denial of its application for a stay of the permanent injunction. This court granted both motions and the relief requested therein. This certified appeal followed. See footnote 1 of this opinion. Additional facts will be set forth as necessary.

The defendants raise three claims on appeal. First, they contend that the trial court improperly determined that the plaintiffs had a vested right to the specific medical benefits in effect under the collective bargaining agreement at the time the retirees retired. Second, they contend that the trial court improperly determined that the legislature did not empower the oversight board, pursuant to S.A. 01-1, to modify the plan. Third, they contend that the court improperly awarded injunctive relief when a less drastic remedy

was available that would both protect the plaintiffs' interests and effectuate the city's financial recovery goals. We agree with the defendants' first claim and therefore do not reach the latter two claims.

The issue of whether the trial court properly determined that the plaintiffs had a vested right to the specific medical benefits under the collective bargaining agreement in effect at the time of the retirees' retirement requires us to resolve two questions. The first question is whether the plaintiffs' right to benefits survived the termination of the collective bargaining agreements and thereby vested. Should we answer that question in the negative, we need go no further. Should we answer that question in the affirmative, however, the second question we must answer is whether that vested right encompasses the specific benefit plan prescribed in the agreements, thereby precluding the defendants from changing the plaintiffs' coverage to the new managed care plan. In other words, the first question goes to the duration of the plaintiffs' right and the second question goes to the scope of that right.[8]

---

[8] We recognize that, typically, although not always; see part II of this opinion; courts begin and end with the question of whether the right to benefits survives the agreement, thereby vesting, without addressing the question of the scope of the benefits. The reason for doing so is self-evident in those cases in which the courts respond in the negative to the vesting question. If the right does not survive the agreement, its scope is irrelevant. We surmise that, in those cases in which the courts have concluded that the right does survive, the factual context was weighed against the need to inquire into the specific scope of the right to medical benefits. Often these cases come to the appellate court on a motion for summary judgment solely on the general vesting issue; see, e.g., *Maurer* v. *Joy Technologies, Inc.*, 212 F.3d 907, 914–17 (6th Cir. 2000); *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America* v. *Yard-Man, Inc.*, 716 F.2d 1476, 1479–82 (6th Cir. 1983); *Roth* v. *Glendale*, 237 Wis. 2d 173, 179, 614 N.W.2d 467 (2000); or under circumstances in which the employer has terminated benefits altogether; see, e.g., *Howe* v. *Variety Corp.*, 896 F.2d 1107, 1108 (8th Cir. 1990); *Myers* v. *Schenectady*, 244 App. Div. 2d 845, 846, 665 N.Y.S.2d 716 (1997), appeal denied, 91 N.Y.2d 812, 695 N.E.2d 717, 672 N.Y.S.2d 848 (1998); or when it is undisputed that the modification of benefits resulted in a substantial decrease in services or increase in cost. See, e.g., *Anchorage* v. *Gentile*, 922 P.2d 248, 252 (Alaska 1996).

We conclude that the trial court properly determined that the plaintiffs' right survived the expiration of the collective bargaining agreements. We further conclude, however, that the trial court improperly determined that the plaintiffs had a vested right to the specific plan in effect at the time they retired.

## I

We begin with the question of whether the plaintiffs' right to benefits survived the termination of the collective bargaining agreements. It is well settled law that contractual obligations will not, in the ordinary course, survive beyond the expiration of a collective bargaining agreement. *Litton Financial Printing Division* v. *National Labor Relations Board*, 501 U.S. 190, 207, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991); *United Food & Commercial Workers International Union* v. *Gold Star Sausage Co.*, 897 F.2d 1022, 1026 (10th Cir. 1990).[9] It is also well settled, however, that "[e]xceptions [to that rule] are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement." *Litton Financial Printing Division* v. *National Labor Relations Board*, supra, 207; accord *Bidlack* v. *Wheelabrator Corp.*, 993 F.2d 603, 606 (7th Cir.) (plurality), cert. denied, 510 U.S. 909, 114 S. Ct. 291, 126 L. Ed. 2d 240 (1993).

## A

A preliminary question raised by the parties in the present case is whether, in order to interpret the

---

[9] Although we are not bound by federal law in the present case, we often have looked to federal labor law when it is consistent with Connecticut labor law; see *Danbury* v. *International Assn. of Firefighters, Local 801*, 221 Conn. 244, 251, 603 A.2d 393 (1992); *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 120, 584 A.2d 1172 (1991); and, in the present case, we do so to the extent that its approach to construing contracts in the context of collective bargaining is consistent with Connecticut law.

agreements to determine whether the right to benefits survived the agreements' termination, a particular legal presumption should be imposed, either against vesting or in favor of vesting. This question has been the subject of extensive debate, both in the courts and in academia. See generally C. Fisk, "Lochner Redux: The Renaissance of Laissez-Faire Contract in the Federal Common Law of Employee Benefits," 56 Ohio St. L.J. 153 (1995); D. Weckstein, "The Problematic Provision and Protection of Health and Welfare Benefits for Retirees," 24 San Diego L. Rev. 101 (1987); D. Sondgeroth, note, "High Hopes: Why Courts Should Fulfill Expectations of Lifetime Retiree Health Benefits in Ambiguous Collective Bargaining Agreements," 42 B.C. L. Rev. 1215 (2001).

The defendants contend that, pursuant to our decisions in *Pineman* v. *Oechslin*, 195 Conn. 405, 415, 488 A.2d 803 (1985), and *Fennell* v. *Hartford*, 238 Conn. 809, 816, 681 A.2d 934 (1996), as well as case law from other jurisdictions, we should impose a presumption against vesting in the absence of unambiguous express vesting language. Conversely, the plaintiffs urge us to reject such a presumption and to rely on case law imposing a presumption in favor of vesting. This issue raises a question of law over which we exercise plenary review. *DeLeo* v. *Nusbaum*, 263 Conn. 588, 593, 821 A.2d 744 (2003).

The Connecticut cases cited by the defendants are inapposite. In *Pineman* v. *Oechslin*, supra, 195 Conn. 406, the issue was whether state employees had a vested, contractual right to benefits under the State Employees Retirement Act, General Statutes § 5-152 et seq. Our decision therein resolving that question in the negative was predicated on the absence of express language in that act evincing an intent to create a contract. Id., 416; accord *Cece* v. *Felix Industries, Inc.*, 248 Conn. 457, 465, 728 A.2d 505 (1999). In the present case, there is no question that the collective bargaining agreements

at issue are contracts. Moreover, although our decision in *Pineman* recognized that such contractual obligations should not be construed lightly because of their binding effect on future legislatures, we also recognized two other issues relevant to the present case: (1) that retirement benefits are not mere gratuities; and (2) that employees have enforceable rights once they satisfy the eligibility criteria under the State Employees Retirement Act. *Pineman* v. *Oechslin*, supra, 416–17. In *Fennell* v. *Hartford*, supra, 238 Conn. 816–17, we concluded that a pension manual created and distributed by the defendant city pension commission was not an implied contract because the pension commission did not have the authority to confer benefits not provided for by the city's charter. By contrast, there is no doubt in the present case that the city had the authority to enter into an express contract and confer the benefits at issue.

As to the case law from other jurisdictions cited by both parties, we note that most of it arises in the context of claims in which the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., is at issue. ERISA does not apply to government sponsored benefit plans.[10] See 29 U.S.C. § 1003 (b). The

---

[10] In the context of government sponsored plans for municipal employees, our review of the case law from other states reflects a mixed record of success for retired municipal employees asserting vested rights to medical benefits, principally dependent on whether the right alleged arises under a collective bargaining agreement. Compare *Anchorage* v. *Gentile*, 922 P.2d 248, 252 (Alaska 1996) (vested right under agreement; city precluded from substantially increasing retirees' deductibles and copayments), *Law Enforcement Labor Services, Inc.* v. *Mower*, 483 N.W.2d 696, 697–98 (Minn. 1992) (vested right under agreement; county employer could not modify employer fully paid benefits to require copayment of benefits), *Della Rocco* v. *Schenectady*, 252 App. Div. 2d 82, 84, 683 N.Y.S.2d 622 (1998), appeal dismissed, 93 N.Y.2d 1000, 717 N.E.2d 1082, 695 N.Y.S.2d 745 (1999) (vested right under agreement; affirming summary judgment in favor of plaintiff retirees challenging defendant city's modification of benefits to coincide with active employee benefits), *Myers* v. *Schenectady*, 244 App. Div. 2d 845, 846, 665 N.Y.S.2d 716 (1997), appeal denied, 91 N.Y.2d 812, 695 N.E.2d 717, 672 N.Y.S.2d 848 (1998) (vested right under agreement; affirming summary judgment in favor of plaintiff retirees challenging defendant city's cessation

courts applying ERISA uniformly hold that, although the law does not require the vesting of health insurance plans, as it does for pension plans, employers may create vested rights in such benefits when the intent is expressed unambiguously. *American Federation of Grain Millers* v. *International Multifoods Corp.*, 116 F.3d 976, 980 (2d Cir. 1997). From that starting point, however, several different approaches have emerged. Some courts impose a presumption that there is no vesting in the absence of a written, unambiguous expression of intent to do so, whereas others impose a presumption in favor of vesting if there is some ambiguity in the language conferring the benefit. See *Rosetto* v. *Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir. 2000), cert. denied, 531 U.S. 1192, 121 S. Ct. 1191, 149 L. Ed. 2d 107 (2001) (noting various approaches); *American Federation of Grain Millers* v. *International Multifoods Corp.*, supra, 980 (same); see generally D. Sondgeroth, supra, 42 B.C. L. Rev. 1229–42 (discussing different presumptions applied and rationales offered in support thereof).

In our view, the rationales articulated for either presumption are not particularly persuasive. The courts imposing a presumption *against* vesting base that approach largely on their construction of ERISA—drawing an adverse inference from Congress' decision to require vesting for *pension* rights, but not to include a comparable requirement for welfare benefits. See,

---

of reimbursement of medicare costs), and *Roth* v. *Glendale*, 237 Wis. 2d 173, 188–89, 614 N.W.2d 467 (2000) (reversing summary judgment in favor of city and remanding in absence of sufficient factual record for determination on vesting question under agreement with direction to apply presumption in favor of vesting) with *Colorado Springs Fire Fighters Assn., Local 5* v. *Colorado Springs*, 784 P.2d 766, 770–73 (Colo. 1989) (no vesting under city ordinance), *In the Matter of Aeneas McDonald Police Benevolent Assn., Inc.* v. *Geneva*, 92 N.Y.2d 326, 330, 703 N.E.2d 745, 680 N.Y.S.2d 887 (1998) (no vesting pursuant to city council resolution), and *Davis* v. *Wilson County*, 70 S.W.3d 724, 727–28 (Tenn. 2002) (no vesting pursuant to county resolution).

e.g., *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W.* v. *Skinner Engine Co.*, 188 F.3d 130, 137–38 (3d Cir. 1999); id., 139 (citing several courts that apply this rationale); see also C. Fisk, supra, 56 Ohio St. L.J. 172–73. In the absence of a comparable statutory scheme in the present case, no such adverse inference is warranted. Moreover, we agree with the Court of Appeals for the Seventh Circuit that, although requiring express terms, such as "vested," "accrued" or "guaranteed," facilitates the court's function in interpreting contracts, that rationale is an inadequate basis for imposing such a requirement when the parties' intent otherwise can be ascertained.[11] *Bidlack* v. *Wheelabrator Corp.*, supra, 993 F.2d 607; accord *Anchorage* v. *Gentile*, 922 P.2d 248, 256–57 (Alaska 1996). Conversely, those courts that impose a presumption *in favor* of vesting rely on the status-based nature of retirement benefits and shift the burden to the employer to *disprove* vesting based on a contractual ambiguity. See *Maurer* v. *Joy Technologies, Inc.*, 212 F.3d 907, 914–17 (6th Cir. 2000) (reiterating holding of *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America* v. *Yard-Man, Inc.*, 716 F.2d 1476 [6th Cir. 1983], seminal case articulating this view); *Roth* v. *Glen-*

---

[11] Judge Posner, in a plurality opinion for the Court of Appeals for the Seventh Circuit, contended that, requiring specific vesting language "could be defended only as a means of making life simpler for courts by creating a form that parties must use to create enforceable rights and obligations; and while we naturally are sympathetic to the institutional concerns behind such a suggestion, we do not think that a court should refuse to enforce a contract merely because the parties have failed to use a prescribed formula. It is one thing for a court to lay down default rules to solve contractual disputes when the parties' intentions cannot be determined. That is a wholly appropriate judicial function. It is another thing for us to say to the contract parties, we can see what you're driving at but as you have not used our preferred form of words we shall not enforce your contract. . . . [C]ourts should be cautious about adding formal hoops that contract parties must jump through . . . ." (Citation omitted.) *Bidlack* v. *Wheelabrator Corp.*, supra, 993 F.2d 607.

*dale*, 237 Wis. 2d 173, 184–85, 614 N.W.2d 467 (2000), and cases cited therein. In our view, this burden shifting is inconsistent with the principle that contractual obligations generally cease at the termination of a collective bargaining agreement. See *Litton Financial Printing Division* v. *National Labor Relations Board, supra,* 501 U.S. 207; *United Food & Commercial Workers International Union* v. *Gold Star Sausage Co., supra,* 897 F.2d 1026.

We also conclude that neither presumption adequately takes into account the competing and significant policy concerns at issue. From the employer's perspective, courts should not impose lightly an indefinite financial obligation when, unlike with pension plans, the employer lacks the ability to predict or control costs. Indeed, this concern is of heightened importance in the public employment sphere. A municipality must ensure its fiscal integrity to provide not only benefits for past and future employees, but also necessary services to its residents. Furthermore, courts should hesitate to presume a vesting intent when the result could well be to discourage employers from providing such benefits in the first instance.[12] See C. Fisk, *supra,* 56 Ohio St. L.J. 159 ("[s]tringent regulation to protect employees will increase the cost of benefits to employ-

---

[12] It is common knowledge that the lack of health insurance for many Americans has been the source of ongoing debates in Congress and state legislatures. Most Americans who are insured get health benefits through their employment. A. Sulentic, "Promises, Promises: Using the Parol Evidence Rule to Manage Extrinsic Evidence in ERISA Litigation," 3 U. Pa. J. Lab. & Emp. L. 1, 2, 10–11 (2000–2001). As a result of rising health care costs, more employers are beginning to cut back or eliminate altogether health insurance coverage. Id., 13–15, 16 n.60. According to the Employee Benefit Research Institute, in 1993, 40 percent of companies with 500 or more employees offered health benefits for current and future medicare eligible retirees. That figure declined to 23 percent in 2001. P. Frostin & D. Salisbury, "Retiree Health Benefits: Savings Needed to Fund Health Care in Retirement" (Employee Benefit Research Institute, February 2003) p. 6, fig. 1.

ers and thus, at some point, will create an incentive for employers to exercise their prerogative not to provide benefits at all").

From the employee's perspective, the promise of health insurance benefits at retirement may be a significant inducement in determining employment. *Roth* v. *Glendale*, supra, 237 Wis. 2d 184–85; A. Sulentic, "Promises, Promises: Using the Parol Evidence Rule to Manage Extrinsic Evidence in ERISA Litigation," 3 U. Pa. J. Lab. & Emp. L. 1, 2 n.6 and accompanying text (2000–2001); cf. *Bender* v. *Bender*, 258 Conn. 733, 750, 785 A.2d 197 (2001) (noting in context of pensions benefits, "employers frequently use lucrative retirement packages in lieu of additional salary to attract and retain desirable employees"). Employees reasonably relying on ambiguous terms as making such a promise may be put in an untenable position when their employer unilaterally withdraws or substantially diminishes benefit insurance—incurring a substantial financial burden for which they had not planned at a time when it is least affordable, if they can obtain coverage at all. See *Law Enforcement Labor Services, Inc.* v. *Mower*, 483 N.W.2d 696, 701 (Minn. 1992); see generally P. Frostin & D. Salisbury, "Retiree Health Benefits: Savings Needed to Fund Health Care in Retirement" (Employee Benefit Research Institute, February 2003) p. 13, fig. 9 (comparing cost of health coverage for retiree covered by employer health plan with retiree not covered by plan).

Therefore, we reject both presumptions and conclude that the best course is to apply our well established principles of contract interpretation. We do so mindful of the fact that, in the present case, we have a contract formed between two parties of relatively equal bargaining power. Under these well established principles, "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the

parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 188–89, 819 A.2d 765 (2003).

"[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." Id., 671. By contrast, "language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Levine* v. *Advest, Inc.*, 244 Conn. 732, 746, 714 A.2d 649 (1998).

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, 244 Conn.

280, 290, 709 A.2d 549 (1998). When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. *Levine* v. *Massey*, 232 Conn. 272, 278, 654 A.2d 737 (1995). Extrinsic evidence is always admissible, however, "to explain an ambiguity appearing in the instrument." (Internal quotation marks omitted.) *Hare* v. *McClellan*, 234 Conn. 581, 597, 662 A.2d 1242 (1995). With these principles and standards in mind, we turn to the issue of whether the plaintiffs' right to medical benefits survived the termination of the collective bargaining agreements.

## B

We first consider whether the trial court properly determined that the agreements evinced the parties' intent that the plaintiffs' right to medical benefits survived the termination of the agreements. In addressing this question, the defendants contend that we need to consider only the scope of the benefit conferred to address whether they unilaterally can modify the benefits. Indeed, the defendants have represented to this court, in their brief and at oral argument, that they recognize "that the city is obligated to provide medical benefits for the [plaintiffs] who reasonably expected that such benefits would be available. Only the source and precise scope of that obligation are in dispute." We cannot, however, determine the "source and precise scope" without first addressing the legal predicate to that issue as to whether the right arises from a vested contractual obligation. See *Diehl* v. *Twin Disc, Inc.*, 102 F.3d 301, 309 (7th Cir. 1996) (first considering whether plaintiff retirees had vested right to lifetime benefits and then considering scope of those benefits); *Helwig* v. *Kelsey-Hayes Co.*, 93 F.3d 243, 247 (6th Cir. 1996), cert. denied, 519 U.S. 1059, 117 S. Ct. 690, 136 L. Ed. 2d 613 (1997) (framing issues before court as whether: "[1] the benefits promised to the [employees] vested at the time they retired, and [2] the benefits were not

subject to any modification or termination provision"); see also *Bidlack* v. *Wheelabrator Corp.*, supra, 993 F.2d 609–10 (first addressing general vesting question and then responding to employer's contention that, even if retired employees had vested rights, those rights were limited to those enjoyed by active employees). Accordingly, we first consider whether the plaintiffs in the present case have a vested right to medical benefits that survived the expiration of the agreements.

As with any issue of contract interpretation, we begin with the language of the contract. As we noted previously, with minor exceptions, the 1986, 1989 and 1993 agreements each contained essentially the same language in the relevant provisions.[13] All the retirement related benefits, including those at issue in the present case, were set forth in article XXXIII of the agreements, entitled "Pensions" (retiree provision). The retiree provision provided in relevant part: "Section 1. The retirement and survivor benefits in effect for employees of the Fire Department on December 31, 1971, (as per the provisions of . . . the 1969 Agreement between the City and this Union and as per the provisions of Chapter 27 of the [City Charter]), *shall remain in effect throughout the life of this Agreement* except that such benefits shall be improved as follows:

"(a) The provisions of this Article have been extended to non-members of the bargaining unit . . . .

"Section 2. Each employee shall have vesting rights in his pension benefits after ten (10) years of service regardless of the reason for termination of employment.

\* \* \*

"Section 16. Effective July 1, 1986, the [city] *shall continue in full force and effect* the [medical] benefits

---

[13] For illustrative purposes, unless otherwise indicated, we refer herein to the 1986 agreement as representative of the language utilized in the agreements.

for each . . . employee who retires or dies after July 1, 1986, his spouse, and each eligible dependent of such . . . employee as described as follows . . . .

"Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost, to those eligible." (Emphasis added.)

Two other agreement provisions are relevant to our analysis: article XXVIII, entitled "Insurance," which prescribed the benefits for active employees (active employee provision);[14] and article XXXVIII, entitled "Duration," which set forth the effective and termination dates of the agreement.[15] The active employee pro-

---

[14] Article XXVIII of the 1986 agreement, which set forth the active employee benefits, provided in relevant part: "Section. 1. The City shall continue in full force and effect the insurance program described as follows:

"(a) The Blue Cross semi-private room plan;

"(b) The Blue Cross maternity rider;

"(c) The Blue Shield (formerly Connecticut Medical Service) Basic Century 90 Plan ('basic' meaning that no supplemental or additional endorsements or riders are included);

"(d) The Major Medical Program currently in effect which provides essentially the following: each employee and each eligible dependent is entitled to maximum life coverage, per the provisions of the policy, in the amount of one million (1,000,000.00) dollars. The deductibles and restoration rights and other conditions are set forth in the Master Agreement with the Insurance Company;

"(e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider;

"(f) The Blue Cross-Blue Shield Home and Office Medical Care Rider (which presently has a $5 Deductible) known as the Century 96 Rider to the Century Contract. . . . .

"Section 2. The City will provide the medical insurance program described in Section 1 hereof at no cost to the employee for the coverage of the employee and the eligible dependents of the employee. . . .

"Section 4. The City reserves the right to change insurance carriers so long as the insurance benefits provided by this Article are not diminished. . . ."

The active employees provision also prescribed dental benefits not offered to retirees.

[15] Article XXXVIII of the 1986 agreement provided in relevant part: "This Agreement shall be effective as of July 1, 1986, unless a different effective date is prescribed in this Agreement for any Section or Article of this Agreement, and shall remain in effect through June 30, 1989. However, this Agreement shall be automatically renewed for successive twelve (12)

vision contained the same medical benefits as those provided in the retiree provision, using identical language. The active employee provision also contained a section reserving the city's right to modify, to a limited extent, insurance benefits for active employees; there was no comparable section in the retiree provision.[16]

The trial court relied on the phrase in § 16 of article XXXIII of the agreement providing that the city *"shall continue* in full force and effect the [medical] benefits for each . . . employee who retires . . . after [the execution of this agreement]"; (emphasis added); as the source of contract ambiguity regarding the vesting of rights under the agreement. On appeal, each of the parties contend that this phrase has a different meaning. The defendants contend that it means that the benefits shall continue until the expiration of the agreement, as set forth in the agreement's general duration provision. The plaintiffs contend that it means that the benefits shall continue throughout retirement. We agree that this phrase, in light of the contract as a whole, creates an ambiguity with regard to the duration of medical coverage. See *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W.* v. *Skinner Engine Co.*, supra, 188 F.3d 141 (language " 'will continue,' " when viewed in isolation, subject to equally reasonable interpretations of continuing during retirement and continuing until contract expiration); *Upholsterers' International Union of North America, AFL-CIO* v. *American Pad & Textile Co.*, 372 F.2d 427, 428 (6th Cir. 1967) (language

months' periods unless either party notifies the other in writing between February 1, 1989 and March 1, 1989 (or the February 1st.—March 1st. of any succeeding year) that it desires to negotiate changes in the Agreement. . . ."

[16] Article XXVIII, § 4, of the 1986 agreement provided: "The City reserves the right to change insurance carriers so long as the insurance benefits provided by this Article are not diminished." A similar reservation was added to the retiree benefits provision in the 1995 agreement.

that "[c]ompany will continue to cover such eligible retired employees" is ambiguous).

On the one hand, there is support for the defendants' construction of the phrase. The active employee provision uses the same phrase—"shall continue in full force and effect"—with regard to identical medical benefits. It is undisputed that active employees' benefits continue only until the expiration of the agreement, as that date is set forth in the duration provision. See footnote 15 of this opinion. Therefore, because the phrase "shall continue" means "shall continue until the expiration of the agreement" in the context of active employees under article XXVIII, it is reasonable to assume that the same term is intended to have the same meaning when it is used in the retiree provision. Indeed, there is no additional durational term in § 16 of article XXXIII, setting forth the medical benefits, to contradict that meaning. Cf., e.g., *Devlin* v. *Empire Blue Cross & Blue Shield*, 274 F.3d 76, 85 (2d Cir. 2002) (life insurance benefits " 'for the remainder of their lives' "), cert. denied sub nom. *Empire Blue Cross & Blue Shield* v. *Byrnes*, 537 U.S. 1170, 123 S. Ct. 1015, 154 L. Ed. 2d 911 (2003); *Diehl* v. *Twin Disc, Inc.*, supra, 102 F.3d 306 (medical benefits " 'for lifetime of pensioner' "); *Law Enforcement Labor Services, Inc.* v. *Mower*, supra, 483 N.W.2d 701 ("retired employee shall be allowed to continue [in medical plan] until his death").

On the other hand, there is support for the plaintiffs' construction, namely, that "shall continue" means "shall continue throughout retirement." Significantly, we first note that, § 1 of article XXXIII—carrying over pension and retirement benefits from a prior agreement—uses the phrase "shall remain in effect throughout the life of this Agreement" to indicate the

duration of those benefits.[17] Section 1 therefore clearly indicates that the benefits conferred therein terminate upon the expiration of the agreement. Section 16 of article XXXIII, which sets forth the medical benefits at issue in this case, uses the durational term "shall continue." The use of different durational terms within the retiree provision, therefore, raises a question as to whether the parties intended a different duration in the two sections. See *Maurer* v. *Joy Technologies, Inc.,* supra, 212 F.3d 915 ("[v]ariations in language used in other durational provisions . . . may . . . provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous").

We also note, with regard to the use of the same phrase—"shall continue"—in the sections setting forth medical benefits for both retirees and active employees, that the context in which the benefits are provided to the two groups reasonably suggests that the parties may have intended that the term should have a different meaning as to duration for retirees.[18] In the context of retiree benefits, a construction of the phrase "shall continue" limited to the duration period set forth in the

---

[17] It is noteworthy that a previous collective bargaining agreement, referenced in § 1 of the retiree provision of the 1986 agreement, set forth an organizational structure by which the phrase "shall remain in effect throughout the life of this contract" was a preamble that modified the entire retiree provision as it existed at that time, whereas the phrase "shall continue" modifies only § 1 and not the entire retiree provision in the 1986, or subsequent, agreements. Moreover, in the 1986 agreement and subsequent agreements, there is no reference in § 1 of the retiree provision to § 16 regarding medical benefits, or vice versa. Therefore, we conclude that the durational phrase in § 1 of article XXXIII—"shall remain in effect throughout the life of this Agreement"—modifies only § 1, and not § 16 setting forth the medical benefits at issue.

[18] Indeed, the United States Court of Appeals for the Sixth Circuit recently pondered in a similar case, "to what other date than the death of the retiree or spouse could the word 'continue' apply?" *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America* v. *BVR Liquidating, Inc.,* 190 F.3d 768, 773 (6th Cir. 1999), cert. denied, 529 U.S. 1067, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000).

agreement often would render the benefit inconsequential, lasting months or weeks, as the plaintiffs no longer would be in a position to negotiate with the city over future benefits. See *Myers* v. *Schenectady*, 244 App. Div. 2d 845, 846–47, 665 N.Y.S.2d 716 (1997), appeal denied, 91 N.Y.2d 812, 695 N.E.2d 717, 672 N.Y.S.2d 848 (1998).[19] Indeed, there is textual support in the agreements for the conclusion that the parties intended for retiree medical benefits to be treated differently than active employee benefits. Although, as we noted previously in this opinion, the agreements conferred identical medical benefits on active employees and retired employees, until 1995, only the active employee provision contained a section expressly reserving the city's right to modify medical benefits. See footnote 16 of this opinion. Indeed, there is no reference in the active employee provision to the retiree provision, or

[19] The Appellate Division of the New York Supreme Court explained in this regard: "The health benefits provisions at issue here contain no language indicating the duration for which the City undertook to provide benefits to its retirees. In this regard, the City argues that because the agreements themselves have very clear durational limits, the retirees' entitlement to health benefits necessarily must cease as of the expiration of the various collective bargaining agreements under which they obtained such benefits. This argument, however, ignores the important distinction to be made between retirees and existing City employees. To be sure, the benefits accorded existing City employees may vary from one collective bargaining agreement to another and, hence, during the term of their employment, such employees may gain or lose certain benefits. We must question, however, whether the parties to the collective bargaining agreements at issue here intended the retirees' benefits to be as fungible, inasmuch as at the expiration of such agreements [the union] no longer represents the retirees, has no bargaining rights or obligations on their behalf and, indeed, may not even have the right to bargain voluntarily on their behalf . . . . Accepting [the city's] argument as to the duration of the benefits accorded under that agreement might result in a retiree receiving but a few months or days of benefits thereunder, and the same can be said of each of the subsequent agreements (although none had a durational limit of less than two years). In our view, the potential for retirees to be accorded such patently inconsequential benefits under the agreements further calls into question the intent of the parties in this regard." (Citations omitted.) *Myers* v. *Schenectady*, supra, 244 App. Div. 2d 846–47.

vice versa, as is not uncommon when agreements confer identical benefits.[20] Therefore, the different contexts for receiving benefits and the limitation imposed on active, but not retired, employee benefits reasonably suggest that the parties may have intended that the phrase "shall continue" have a different meaning as to the duration of retiree medical benefits.

Finally, we note some ambiguity as to whether the medical benefits expressly are vested in the agreements. As we noted previously, § 2 of the retiree provision of the agreements provides that "[e]ach employee shall have vesting rights in his pension benefits after ten (10) years of service . . . ." The term "pension," although not defined in the agreements, means, in its usual sense, a deferred wage replacement benefit. *Bender* v. *Bender*, supra, 258 Conn. 743. The term "pension" is also, however, the title of the retiree provision, which sets forth all retirement benefits, *including medical benefits*. This fact raises a question as to whether the parties intended for the phrase "pension benefits" to have a broader meaning in § 2 of article XXXIII, such that all retirement benefits would vest after ten years of service. See footnote 21 of this opinion.

Accordingly, because "the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *United Illuminating Co.*

___

[20] It is not uncommon, when the same benefits are conferred on active employees and retired employees, for collective bargaining agreements to reference both benefits in the same provision. See, e.g., *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America* v. *Yard-Man, Inc.*, supra, 716 F.2d 1480 ("[c]ompany will provide insurance benefits equal to the active group benefits"); *Della Rocco* v. *Schenectady*, 252 App. Div. 2d 82, 84, 683 N.Y.S.2d 622 (1988), appeal dismissed, 93 N.Y.2d 1000, 717 N.E.2d 1082, 683 N.Y.S.2d 745 (1999) (agreement provided for medical benefits " 'equivalent to the plan presently in effect for each member of the [police] [d]epartment and his family, and for retired members and their families' ").

v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 671. Our conclusion, therefore, that the trial court properly concluded that the agreements were ambiguous as to the parties' intent as to whether to vest lifetime medical benefits, has two consequences. First, it permits the trial court's consideration of extrinsic evidence as to the conduct of the parties. *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 546 n.17, 791 A.2d 489 (2002). Second, "the trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 357, 727 A.2d 1260 (1999); accord *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, supra, 244 Conn. 290.

"We construe a contract in accordance with what we conclude to be the understanding and intention of the parties as determined from the language used by them interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . The intention of the parties manifested by their words and acts is essential to determine the meaning and terms of the contract and that intention may be gathered from all such permissible, pertinent facts and circumstances." (Citations omitted; internal quotation marks omitted.) *Blatt* v. *Star Paper Co.*, 160 Conn. 193, 202–203, 276 A.2d 786 (1970); accord *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 327, 714 A.2d 1230 (1998).

In the present case, the defendants do not dispute what the extrinsic evidence revealed—that the city continued to provide medical benefits to the plaintiffs after the expiration of the pertinent collective bargaining agreements under which the retirees retired. Moreover, the defendants do not dispute that they continued to

provide the specific benefit plan in effect at the time the retirees retired.[21] They contended at oral argument before this court, however, that this conduct was merely a result of administrative inefficiency—no one had instructed the city's benefits administrator to make any changes to the existing arrangement.

We conclude that the past conduct of the city just as easily could have been a result of intent as inertia. Compare *Myers* v. *Schenectady*, supra, 244 App. Div. 2d 847 (defendant city's "[nineteen year] practice of continuing to provide fully paid health insurance coverage . . . even after the expiration of the various collective bargaining agreements pursuant to which [retirees] obtained such benefits, constitutes very substantial evidence that the provisions in question were intended to provide benefits to retirees for the entire period of their retirement") with *Howe* v. *Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir. 1990) ("[m]erely because [the] defendants chose to exempt retirees from plan changes in the past does not mean that [they] considered themselves forever bound to do so"). In light of the deferential review that we accord the trial court's findings of fact, however, we cannot conclude that it drew an improper inference that such conduct was purposeful. Indeed, the defendants' concession in this court that the city is "obligated" to provide medical benefits to the plaintiffs in light of their "reasonable expectations" bolsters the trial court's conclusion. Accordingly, we conclude that, in light of the contract ambiguities and the extrinsic evidence, the trial court's conclusion that the plaintiffs

---

[21] One of the plaintiffs, Russ Rosselli, testified regarding his receipt of retirement benefits. Under the 1986 agreement, which was in effect at the time Rosselli retired, employees were vested after ten years of employment, but were not entitled "to retire and receive a service pension" until they had accrued twenty years of service pursuant to article XXXIII, § 9, of the agreement. Rosselli testified that he had retired after sixteen years as a city firefighter, was "held off" from receiving benefits for four years and, *at that time,* had received *both* his pension and medical benefits.

have a vested right to medical benefits that survived the expiration of the collective bargaining agreements was not clearly erroneous.

## II

Having decided that the plaintiffs have a vested right that survived the expiration of the agreements, we next turn to the critical issue in this case—the scope of that right. Specifically, we must determine whether the trial court properly determined that the plaintiffs have a vested right to the *exact plan* of medical coverage under the collective bargaining agreement in effect at the time of the retirees' retirement. The defendants contend that the trial court's conclusion improperly was based on its determination that the agreements were ambiguous as to the parties' intent in this regard. The defendants further contend that, in the absence of any contract ambiguity, the court improperly relied on extrinsic evidence—the city's practice of continuing to provide the specific medical plan in effect at the time of the retirees' retirement—to support its conclusion that the defendants could not make changes to the medical plan. The plaintiffs, relying primarily on the language we identified in part I B of this opinion, contend that the agreements unambiguously manifest the parties' intent to provide the specific benefits set forth therein. Therefore, the plaintiffs contend that the defendants could not change the plaintiffs' medical coverage from the traditional indemnity plan previously provided to the managed care plan. We agree with the defendants that the trial court improperly relied on extrinsic evidence in the face of unambiguous contract language permitting them to make changes to the form, but not the substance, of the benefits provided.[22]

---

[22] Because we agree with the defendants that they retain the right to modify the benefits plan, we do not reach their claim that the city charter, which is incorporated by reference into the collective bargaining agreements, permits it to do so.

The only language that the trial court cited in reaching its conclusion that the plaintiffs have a vested right to the specific plan under the pertinent agreement was that language in § 16 of article XXXIII providing that the city "shall continue in full force and effect the benefits for each employee who retires or dies on or after the execution of this Agreement . . . ."[23] As we discussed in part I B of this opinion, this language reasonably is susceptible to an interpretation favorable to the plaintiffs as to the *duration* of the benefit; it does not, however, address the *scope* of the benefit. Although a right that is vested may not be modified unilaterally; *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W.* v. *Skinner Engine Co.,* supra, 188 F.3d 139; the scope of the right determines whether conduct infringes on that right. See *Diehl* v. *Twin Disc, Inc.,* supra, 102 F.3d 309; *Helwig* v. *Kelsey-Hayes Co.,* supra, 93 F.3d 250.

Several provisions in the agreements manifest the parties' intent that the city retain the right to make limited modifications to the benefits plan. The most obvious permitted modifications are those contained in the 1995 agreement.[24] As we noted previously, the 1995 agreement set forth two changes from prior agreements, both expressly imposing new conditions on retirees, past and present. One change, set forth in § 16 of article XXXIII, permitted the city to modify the plan to provide "similar—but in no event, less—medical benefits" if changes were made to the medical benefits of active employees.[25] The other change, set forth in

---

[23] See § 16 of article XXXIII of the 1989, 1992 and 1995 agreements. The 1986 agreement had similar language; the provision therein, however, included the specific effective date of the agreement.

[24] As we noted previously, the record does not indicate under which particular collective bargaining agreement any individual retiree retired. See footnote 5 of this opinion.

[25] Section 16 of article XXXIII of the 1995 agreement provided in relevant part: "The medical benefits for retirees prescribed in [the preceding paragraphs] may be substituted for similar—but in no event, less—medical bene-

§ 17 of article XXXIII, included a requirement that those retirees who were eligible for medicare must participate in that program, with the city providing reimbursement for the cost of supplemental insurance coverage.[26] These changes evinced that the city: (1) recognized an obligation to retirees that extended beyond the expiration of the preceding agreements, thus supporting our conclusion in part I B of this opinion; and (2) intended to retain authority to make some modifications to the form, but not the substance, of the medical benefits plan.[27]

Even agreements prior to 1995 suggest that the city intended to withhold the right to make reasonable modi-

fits if the City and the Coalition of City Unions agree on a modified insurance plan for City employees; said modified medical program is currently under study by a committee consisting of the representatives of the City and representatives of all City Unions."

[26] Section 17 of article XXXIII of the 1995 agreement provided: "Effective as of the signing of this agreement a retiree, who has attained the age of 65 years and receives medical insurance benefits per the provisions of this Article XXXIII and who is eligible for either (1) Medicare A or B, or (2) Medicare A and B, must participate in the Medicare program in which he is eligible to participate. The City will provide supplemental coverage (the City to reimburse the retiree/spouse of retiree for the cost of the monthly premium for this supplemental coverage, the payment for which will be made in the first instance by the retiree/spouse of retiree); which reimbursement will be made annually to the retiree/spouse of retiree upon proof of payment of the premium for said supplemental coverage by the retiree/spouse of retiree."

[27] All parties concede that the two changes to the 1995 agreement, adding the medicare and modification provisions, were intended to apply to those employees who *already* had retired under agreements prior to 1995, as well as those who retired under the 1995 agreement. The plaintiffs do not concede, however, that the city had the authority to make these changes applicable to those employees who retired prior to 1995, but they never have challenged the city's authority to do so. Nevertheless, it is clear from the 1986 agreement, which expressly included medical benefits for "each retiree and each employee who retires" after a certain date, that the city and the union understood the term "retirees" to mean those employees who already have retired under previous agreements. Accordingly, we conclude that the city and the union believed, when executing the 1995 agreement, that the city had the authority to impose certain modifications on retiree benefits plans.

fications to the plans by referring to specific benefits in a temporal sense. Specifically, beginning in 1986, all of the agreements refer, in § 16 (d) of article XXXIII, to the "Major Medical Program *currently* in effect which provides *essentially* the following [benefits] . . . ." (Emphasis added.) The 1986 and 1989 agreements also referred, in § 16 (f) of article XXXIII, to the "Home and Office Medical Care Rider (which *presently has a $5 Deductible*) . . . ." (Emphasis added.)

Notably, the trial court's memorandum of decision does not address any of the foregoing language in the agreements that expressly or implicitly provides for the city's right to modify the benefits. The court's conclusion that the city could not modify the specific benefits plan under the pertinent collective bargaining agreement rested solely upon the city's long-standing practice of providing to the retirees the specific benefits plan in effect at their retirement. That evidence was sufficient, in combination with the ambiguous duration language in the agreements, to support the court's conclusion that the right to benefits survived the expiration of the agreements. That evidence alone was not sufficient, however, in the absence of *any* textual support in the agreements, to support the trial court's conclusion that the parties manifested an intent to vest in the plaintiffs the specific benefits plan, unalterable by the city. See *In the Matter of Aeneas McDonald Police Benevolent Assn., Inc.* v. *Geneva,* 92 N.Y.2d 326, 333, 703 N.E.2d 745, 680 N.Y.S.2d 887 (1998) ("past practice, like any other form of parol evidence, is merely an interpretive tool and cannot be used to create a contractual right independent of some express source in the underlying agreement"). Accordingly, we conclude that the trial court's decision was clearly erroneous in that respect. See *Frillici* v. *Westport,* 264 Conn. 266, 277, 823 A.2d 1172 (2003) ("finding of fact is clearly erroneous when there is no evidence in the record to support

it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" [internal quotation marks omitted]).

Nonetheless, we are faced with the question of whether, despite the city's retention of the right to make some modifications to the medical benefits plan, the defendants violated the plaintiffs' vested contractual right to the benefits generally. In this regard, we agree with the approach taken recently by the Court of Appeals for the Seventh Circuit when facing a similar situation in *Diehl* v. *Twin Disc, Inc.*, supra, 102 F.3d 301. That court stated: "The [plaintiff retirees] maintain that they contracted for exactly the same insurance coverage that they were receiving by virtue of the 1983 Insurance Agreement. At the other extreme, [the defendant company] . . . presumably would argue that [its] duty to provide lifetime coverage is satisfied so long as the [defendant] maintains some insurance coverage, however reduced. The interpretive dilemma that we confront here is one of vagueness rather than ambiguity. We are faced, not with a choice between two reasonable interpretations, but with a continuum of options that lies between these two intuitively implausible results. If [the defendant] were permitted to 'modify' coverage until it became all but nominal, the promise of lifetime benefits would begin to look rather illusory. On the other hand, we cast a cold eye on the claim that [under a subsequent 1986 agreement] [the defendant] contracted to provide for the life of its retirees the precise benefits described . . . previously." Id., 309.

In *Diehl*, the Seventh Circuit concluded that, in light of the defendant's reservation of its right to modify the plan, "the [1983] Insurance Agreement obligated [the defendant] to secure a certain level of benefits, and [the defendant] presumably remained free to negotiate with various insurance carriers (or to self-insure) and to

impose cost-saving measures that did not substantially reduce benefits. But in exercising this discretion, [the defendant] could not have been free to arrange for coverage that would eviscerate the promise of benefits. We therefore would read the [1986 agreement] as requiring [the defendant] to expend reasonable efforts to secure coverage at a level substantially commensurate with the benefits provided under the [1983 agreement in effect at the time of the plaintiffs' retirement]. We believe that this understanding most accurately reflects the intent of the parties." Id., 310.

Indeed, we note that it runs counter to all of the parties' interests to construe the agreements in the present case as conferring on the plaintiffs the *exact* plan set forth under the agreement in effect at the time of the retirees' retirement.[28] The continued availability of the pertinent plan is dependent upon a third party not bound beyond the term of the agreements—the insurer. See footnote 6 of this opinion. The insurer could decide to discontinue coverage of city employees or discontinue the particular plan. It also could raise the cost of coverage to the point that it no longer would be feasible for the city to procure the insurance. The defense of impossibility of performing the contract, therefore, would release the city from its obligation and leave the retirees with no medical insurance.

Therefore, in accordance with the Seventh Circuit, we conclude that "[t]he plaintiffs . . . bear the burden of demonstrating that the changes brought their benefits below a level reasonably commensurate with the coverage that they had enjoyed theretofore. . . . We caution that it will not suffice for the plaintiffs to demon-

---

[28] We note that, should other parties intend a different construction of their contract by the courts, they readily may ensure such a result by negotiating and expressly setting forth terms that clearly demonstrate their intent that the right vest, or not vest, or their intent that the benefit be or not be subject to specific modifications.

strate that the changes have increased payments for some retired employees. The changes should be examined for their effect on the class of retirees as a whole, to determine if they have significantly reduced their general level of benefits. In addition, individual modifications should not be scrutinized in isolation. In other words, the changes must be examined in their totality for their effect upon the class of retirees as a group." *Diehl* v. *Twin Disc, Inc.*, supra, 102 F.3d 311.

Accordingly, in order for the plaintiffs to prevail, they must demonstrate that the changes to their benefits are not substantially commensurate with the benefits provided under the agreements in effect at the time of the retirees' retirement, when viewing the group of plaintiffs as a whole. We conclude that, under the facts found by the trial court, the plaintiffs cannot meet this burden as a matter of law.

The trial court made the following factual findings as to the differences between the traditional indemnity plan and the new managed care plan, which are, with one exception, undisputed by the parties.[29] The trial court identified five areas of change from the traditional indemnity plan to the managed care plan that created the cost savings sought by the defendants, three[30] of which affect the plaintiffs directly. The first area of change is that, under the managed care plan, the plain-

[29] The defendants dispute the trial court's findings regarding the management of treatment services and the scope of out-of-state network providers. See footnote 31 of this opinion. We treat the court's factual findings as undisputed, however, in light of our conclusion that, even if we were to accept those factual findings as proper, the defendants retain the right to shift the plaintiffs to the managed care plan.

[30] In addition to the three areas of change discussed in the text of this opinion, the two other areas of change are: (1) the provision of an incentive for the patient or care provider to select lower cost generic prescription drugs, rather than name brand drugs; and (2) the consolidation of all city employees under one or two insurance plans, rather than the numerous and varied plans under which the city previously was obliged to provide benefits.

tiffs are required to submit a copayment for each health service utilized—ranging in amount from $5 to $15 per visit. Even under the indemnity plan, the plaintiffs faced the possibility of incurring some financial costs—they were reimbursed for medically necessary services, up to a certain combined cap, after which they might be obligated to contribute a "deductible" amount.

The second area of change would come from using a specific network of health care providers under the managed care plan, with whom the insurer has negotiated set rates of payment for services. Under the traditional indemnity plan, the plaintiffs could choose their own provider. Under the new plan, the plaintiffs still may use their own provider, but if that provider does not belong to the insurer's network, the plan generally will not cover the full cost and the plaintiffs will have to pay the cost difference directly to the provider.

The third area of change is the imposition of management on the utilization of services. Under the traditional indemnity plan, the insured patient and the physician alone decided what services were medically necessary. Under the managed care plan, the insurer maintains certain schedules of levels of services, which establish a presumption as to the appropriate amount of service based on the particular medical condition. The presumption can be overcome only through a consultation with the insurer. The trial court noted that "[o]ften the consultation is less [a consultation] than a negotiation. At worst it may result in a denial of services . . . ." The court also noted, however, that an insured who wants to challenge a denial of services may initiate an administrative type of appeals process to the insurer.

The trial court's ultimate conclusion, despite these differences, was that, although "a managed health care plan is inherently less flexible than the traditional indemnity plan, it is by no means certain from the evi-

dence that a given beneficiary will always fare worse under the new health care plan than the old. . . . Depending on what health problems occur for a specific beneficiary and what services or prescription medications are necessary, the evidence demonstrated that there are situations in which the out-of-pocket costs can indeed be greater under the old plan than the new." The court further concluded that "[t]he plaintiffs here have succeeded in showing that there are significant differences between the . . . plans . . . . The court cannot conclude that the differences are trivial, even though the plaintiffs have not shown that over their life expectancy they will suffer a specific quantifiable loss."

In our view, these findings and conclusions fall short of establishing that the "significant differences between the . . . plans" resulted in a new plan that either substantially reduced the provision of services or substantially increased the cost to the group of plaintiffs as a whole.[31] Accordingly, the modifications made by the defendants affected the form, and not materially the substance, of the vested benefit. We need not, in the present case, delineate the precise contours of the substance of the vested benefit.

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other justices concurred.

---

[31] Because we view the issue as it pertains to the group of plaintiffs as a whole, we do not address their concerns as to those few plaintiffs who either need to, or may need to, use out-of-state providers.