Dear Senator Kasemeyer and Delegate James,
You have asked for our opinion on several issues related to the State's funding of retiree health benefits. Your questions are prompted by new standards recently adopted by the Government Accounting Standards Board ("GASB") that affect how a government employer is to account for liabilities related to employee benefits. In particular, GASB Statement 45 ("GASB 45") requires that a government employer accrue liabilities associated with the employer's commitment to retiree benefits and recognize them on its balance sheet.
You have asked:
1. Does the State have a statutory, contractual, or other legal obligation to provide or to continue to provide health benefits to any of the following groups: current vested retirees receiving health benefits; employees or former employees that have fully vested with 16 years of creditable service (deferred vested individuals); current employees with less than 16 years of State service who may vest at a later date; or future employees?
2. In terms of other states and local governments, particularly with regard to other AAA bond-rated states, does any relevant case law exist regarding the provision or alteration of retiree health benefits, and if so, how are these cases distinguishable from the situation in Maryland?
3. Are there any legal distinctions between the contractual rights that exist for pension benefits and promised retiree health benefits? Specifically, does the fact that the health insurance benefit accrues over the career of an employee similar to pension benefits create a similar contractual right to those benefits? Because current case law in Maryland indicates that the contractual right to pension benefits accrues over the career of an employee, does the fact the health insurance benefits accrue over the career of an employee result in a similar contractual right to those benefits? Additionally, since case law indicates that the contractual right to pension benefits is created at the time the employee vests in the pension system, if there is no contractual right to health insurance benefits, how is vesting for pension benefits distinguished from vesting for retiree health insurance benefits?
4. Can the State's legal obligations regarding retiree health care for any of the enumerated groups in question one be altered as the result of a collective bargaining agreement entered into by the Administration and employee representatives?
5. GASB Statement 45 will require the State to report liabilities and obligations for retiree health care in the same way as pension liability. Does GASB 45 create any legal obligation for the State to treat promised retiree health benefits the same as promised pension benefits? Additionally, GASB 45 strongly encourages prefunding of retiree health liabilities in the same manner as pensions are prefunded. If the State were to create a non-revocable trust fund in response to the GASB 45 requirements, does this action create any legal obligation to provide retiree health benefits to any of the groups enumerated in the first question and if so, at the current level or some other level? Does this change if the employees are required to make a contribution towards retiree health care similar to the employee pension contribution?
Our answers to your questions are explained below. In summary, it is our opinion that:
1. The State currently has a statutory obligation to provide health care benefits to certain retirees; however, the statute does not create a contractual obligation and the General Assembly remains free to amend the law that provides such benefits. Although the General Assembly may choose to confer a vested right in retiree health care benefits, it has not done so. Even a contractual right to health care benefits would be subject to modification if reasonable and necessary to serve an important public purpose.
2. With respect to other states that, like Maryland, enjoy the highest credit rating from the bond rating agencies, we found no relevant case law. There are cases in other states that have reached various conclusions; some of those decisions recognize a contractual obligation to provide health care benefits to retirees. However, those cases are of limited value in construing Maryland law as they are based on the particular state constitution, statute, collective bargaining agreement, or other circumstances peculiar to the case.
3. In contrast to retiree health care benefits, pension benefits are contractual in nature. The statutes creating the various retirement systems explicitly vest certain rights in retirees with respect to the type and level of benefits, while the statute concerning retiree health care benefits does not. Prior opinions of this Office and court decisions confirm that the pension benefits are a contractual obligation. The fact that the amount of a retiree's subsidy for health care benefits may be related to length of State service does not alter this essential distinction.
4. Collective bargaining negotiations could result in changes in the State's legal obligations concerning retiree health benefits, but only if the General Assembly specifically adopted those changes.
5. GASB 45, as an accounting standard issued by a private entity, does not itself impose any legal obligation on the State concerning the level or funding of retiree health care benefits. Nor does it express a preference for or prescribe the timing or the method of financing retiree health care benefits. The creation of an irrevocable trust to fund retiree health care benefits could be part of a contractual undertaking of the State to provide those benefits. If the trust fund consisted in part of employee contributions, there may be a stronger argument that the State had undertaken to devote the funds in the trust to retiree health care benefits.
 I Background
A. Retiree Health Care Benefits
 1. State Employee and Retiree Health and Welfare BenefitsProgram
The General Assembly has provided for health care benefits for retired public employees in Maryland as part of the State Employee and Retiree Health and Welfare Benefits Program ("Program"). Annotated Code of Maryland, State Personnel and Pensions Article ("SPP"), § 2-501 et seq. The Program is to be available to employees in all units of State government, including units with independent personnel systems. SPP § 2-502(b).
The Department of Budget and Management ("DBM") is charged with administration of the Program. SPP §§ 2-502, 2-503. The Legislature has given the Secretary of DBM broad discretion to design the type and level of benefits available through the Program. SPP § 2-503(b) ("[t]he Secretary may arrange as the Secretary considers appropriate any benefit option . . ."). In exercising that discretion, the Secretary may consider recommendations from the Health Insurance Advisory Council, an advisory body consisting of representatives of various State entities, employee organizations, and the public. SPP §§ 2-505, 2-506, COMAR 17.04.13.02.[1] The Secretary also is to specify by regulation the eligibility of various categories of employees for the Program and the extent of any State subsidy provided in connection with the Program. SPP § 2-503(c).[2]
The Secretary has adopted regulations specifying the eligibility standards for benefits, among other things. COMAR 17.04.13.
On an annual basis, the Secretary is to recommend to the Governor the State's share of costs of the Program for inclusion in the State Budget. SPP §§ 2-503(a)(3), 2-504. Finally, the Secretary is charged with ensuring that the Program complies with federal and State laws governing employee benefit plans. SPP § 2-503(a)(2).
During its past two sessions, the General Assembly limited the Secretary's discretion in some respects. In 2004, in the wake of federal legislation that created prescription drug coverage under Medicare Part D, it directed that the Program is to include a prescription drug benefit plan, although it did not specify any particular elements of that plan. Chapter 296, Laws of Maryland 2004, codified at SPP § 2-509.1.[3] In 2005, the Legislature gave the Secretary specific criteria for designing the Program for fiscal years 2006 and 2007. Chapter 444, § 7, Laws of Maryland 2005. In particular, the Legislature directed that the Program provide "the same health insurance benefits options, prescription drug benefits options, copremiums and co-payments" as were provided by the Program on January 1, 2005. SPP § 25-02(c). That legislation also limited the increase in a participant's share of premiums in the point-of-service health plan and specified certain parameters for pharmaceutical benefits.[4]
In 2005, the General Assembly also created a special fund called the State Employees and Retirees Health and Welfare Benefits Fund to help finance health care benefits. Chapter 444, § 1, Laws of Maryland 2005, codified at SPP § 2-516. This fund is to consist of moneys appropriated for the fund or authorized to be transferred to it in the State budget. SPP § 25-16(c)(2). For fiscal years 2006 and 2007, any federal subsidy received with respect to Medicare Part D also is to be deposited in the fund. SPP § 2-516(c)(1).[5] Moneys in the fund are to be retained in reserve and used only to fund the Program pursuant to budget amendment. SPP § 2-516(d).
2. Provisions Related to Retiree Benefits
The statute governing the Program provides that certain categories of retirees "may enroll and participate in the health insurance benefit options established under the Program." SPP § 2-508(b)(1).[6] While the General Assembly has accorded the Secretary of DBM considerable discretion in designing the Program, it has established certain criteria for the participation of retirees in the Program that relate to the length and dates of State service. Id. Further, a retiree who chooses to participate in the Program is entitled to a State subsidy of the benefits if the retiree has five or more years of "creditable service."[7] SPP § 2-508(c). The amount of the subsidy increases with each additional year of creditable service up to 16 years, when it is to equal the subsidy provided to current employees. Id. A retiree who receives a disability retirement allowance is also entitled to a subsidy equal to that of a current employee. SPP § 2-508(c)(1); COMAR 17.04.13.05A(5). In addition, under the DBM regulations, a retiree who retired prior to July 1, 1984,[8] and an individual who receives a special death benefit under the State Police Retirement System[9] are also entitled to equivalent subsidies. COMAR17.04.13.05A(1), (6).
If a retiree is eligible for Medicare Parts A and B, the benefits are converted to a Medicare Supplemental Program; any benefits provided by that program are reduced by the amount that would be provided by Medicare, regardless of whether the retiree has actually enrolled in Medicare. COMAR 17.04.13.08. As noted above, since 2004, the Legislature has also directed that "[t]he State shall continue to include a prescription drug benefit plan in the health insurance benefit options established under the Program and available to retirees . . . notwithstanding the enactment of [Medicare Part D] or any other federal law permitting states to discontinue prescription drug benefit plans to retirees of a state." SPP § 2-509.1.
The State currently finances retiree health care benefits in the same way as employee benefits — through the annual budget process. See SPP § 2-504; Joint Committee on Pensions, 2004 Interim Report, Report on State's Unfunded Retiree HealthcareLiability, pp. 178-79. Recently, the Legislature created the Postretirement Health Benefits Trust Fund ("Trust Fund") to assist in the future financing of the retiree health insurance subsidy provided by the Program. Chapter 466, Laws of Maryland 2004, codified at SPP § 34-101. The Trust Fund is to consist of any federal moneys received by the State as a result of the Medicare Part D program or any similar federal subsidy related to the State's prescription drug program for fiscal year 2008 and later. SPP § 34-101(d). Any moneys deposited in the Trust Fund are to accumulate and no payments may be made until after fiscal year 2017. SPP § 34-101(g). Thereafter, moneys from the Trust Fund are to be transferred to the State's general fund on an annual basis to help finance the subsidy for retiree health care benefits according to a formula. SPP § 34-101(h).[10] If the State discontinues that subsidy, any moneys in the Trust Fund are to be transferred to the general fund. SPP § 34-101(i).
B. GASB 45
GASB was created in 1984 by the Financial Accounting Foundation to establish and improve standards for financial accounting and reporting for state and local government entities. See Facts About GASB, www.gasb.org/facts/mission.html. As an independent, not-for-profit, private organization, it has no power to impose its standards on government entities. However, GASB standards are considered part of generally accepted accounting principles (GAAP).[11] Government auditors and other oversight officials, as well as the municipal bond industry and other users of government accounting and financial reports, look to compliance with GASB standards as a benchmark for financial reporting. GASB describes its authority as follows:
 The GASB is not a federal agency. The federal government does not fund GASB, and its standards are not federal laws or rules. The GASB does not have enforcement authority to require governments to comply with its standards. However, compliance with the GASB's standards is enforced through the audit process, when auditors render opinions on the fairness of presentations to conformity with GAAP, and through the laws of individual states, many of which require local governments to prepare GAAP basis financial statements. In addition, the municipal bond industry prefers that governments issuing debt prepare their financial statements on a GAAP basis.
GASB, GASB at a Glance, Question 8.
In 2004, GASB issued Accounting and Financial Reporting byEmployers for Postretirement Benefits Other than Pensions,Statement on Governmental Accounting Standards No. 45 (2004). GASB 45 applies to government employers who provide post employment benefits in addition to pensions — referred to as Other Post Employment Benefits or "OPEB." OPEB includes health care benefits, and also may include other benefits provided separately from pension benefits. GASB, Summary of Statement 45 (June 2004), www.gasb.org/st/index.html. Under the theory that OPEB are part of the compensation earned by employees for services rendered, benefits are earned and employers incur a cost for those benefits as services are rendered. Id. GASB 45 requires that the liability for such obligations be accrued to provide a more accurate accounting of the cost of OPEB at the time services are performed. Id. GASB 45 provides for implementation of the standard by a government entity such as the State in fiscal year 2008.[12]
To comply with GASB 45, a government employer will have to report OPEB costs on an accrual basis. In order to do that, it will have to obtain an actuarial valuation of OPEB costs. Such a valuation involves a projection of future cash outlays for benefits, based on various assumptions, the discounting of those outlays to a current present value, and the amortization of that sum over a period that approximates the anticipated years of the average worker's employment. The result is referred to as the government employer's "annual required contribution" or "ARC". The ARC should be sufficient to fund the benefits expected to be earned in the future, as well as to amortize unfunded benefits attributed to the past. GASB, Guide to Implementation of GASBStatements 43 and 45 on Other Postemployment Benefits, p. 29.
GASB believes that this method of reporting will provide "more accurate information about the total cost of the services that a government provides . . ." GASB, GASB Statement 45 on OPEB byGovernments — A Few Basic Questions and Answers, p. 1 (emphasis in original). In addition, it will make clear whether a government has covered its OPEB cost for the year; to the extent that a government chooses to defer that cost, "the higher will be (a) its unfunded actuarial accrued liability and (b) the cash flow demands on the government and its tax or rate payers in future years." Id.
C. Task Force and Valuation Study
During its most recent session, the Legislature created the Task Force to Study Retiree Health Care Funding Options, which you co-chair. Chapter 298, Laws of Maryland 2005. We understand that, in accordance with the 2005 legislation, the Task Force commissioned through DBM an actuarial study of the State's OPEB obligation in connection with the Program. See Aon Consulting,State of Maryland Postemployment Benefits other than PensionActuarial Valuation (October 2005). That study analyzed data provided by the State and, based upon the consultant's understanding of the GASB standards, concluded that the ARC for the State's Fiscal Year 2006 would be $1.959 billion if GASB 45 were currently in effect. Id., p. 6.
 II Analysis
A. The State's Legal Obligation to Provide Retiree Health CareBenefits
You ask whether the State has "a statutory, contractual, or other legal obligation" to provide health care benefits to current retirees and several different categories of future retirees. We address this question with respect to benefits provided under the Program, which were the subject of the recent valuation study.
1. Statutory Obligation
As outlined above, State law currently requires the Secretary of DBM to administer the Program for the benefit of retirees, as well as current employees. The statute does not specify the type or level of benefits that the State is to provide, but delegates that determination to the Secretary, except in two respects. First, the Legislature has required the Secretary to include the same benefit options for fiscal years 2006 and 2007 as were part of the Program on January 1, 2005. Second, there must be a prescription benefit plan as part of the Program, although the Legislature has not specified any particular elements of that plan except for fiscal years 2006 and 2007.
While the statute provides for a State subsidy of the costs of the Program — a subsidy that is to be pro-rated for most employees who retire after July 1, 1984 — it does not set the level of the State subsidy of these benefits. Rather, it contemplates that the Secretary, with the advice of the Health Insurance Advisory Council, will make an annual recommendation to the Governor as to the extent of the State subsidy of those benefits and, accordingly, the amount to be dedicated to that purpose in the State budget. However, the 2005 legislation did place some constraints on the Governor's discretion in this area,[13] as it required the provision of certain benefit options and set a cap on the increase of the employee or retiree share of some premiums for fiscal years 2006 and 2007. See SPP § 2-502(c)(2).
In sum, at present, the State has a general statutory obligation to make available health care benefits for certain retirees and to provide a partial subsidy of those benefits as specified in statute and regulation. The Secretary of DBM and the Governor enjoy relatively unfettered discretion to set benefit and subsidy levels in the proposed budget submitted to the General Assembly for fiscal years subsequent to 2007. While the Legislature may under the State Constitution mandate the inclusion of particular expenditures in the State budget under certain conditions, it has generally not done so with respect to the Program.[14]
Of course, in general, a statute may be amended by the General Assembly. Thus, the General Assembly could alter this statutory obligation at any time, unless there were a constitutional limitation on the Legislature's power to do so. The federal Constitution would limit alteration of the Program by the General Assembly if the amendment of the statute was a "law impairing the obligation of contracts." See United States Constitution, Article I, § 10, cl. 1 ("Contract Clause").
2. Contract Clause Analysis
To assess whether a legislative action impairs contract rights, the first question is whether a contractual obligation exists. There is a strong presumption that statutes do not create contractual rights. Nat'l R. Passenger Corp. v. Atchison, Topeka Santa Fe. R. Co., 470 U.S. 451, 465-66 (1985). "[T]he principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." Id. In determining whether a statute creates a contractual obligation, there must be "an adequate expression of an actual intent" of the state to bind itself. Id. at 466-67. Thus, "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." United States Trust Co.v. New Jersey, 431 U.S. 1, 17 n. 14 (1977). This power is subject to the proviso, under what is known as the reserved powers doctrine, that a state cannot enter into a contract that "surrenders an essential attribute of its sovereignty." Id.
at 23.
If there is a contract, the next question is whether the State's action impairs private rights under the contract. UnitedStates Trust Co., 431 U.S. at 19-21. Even if it does, it may not violate the federal Constitution, as not every impairment by a state of its contractual obligations is prohibited by the Contract Clause. Not all impairments of contractual obligations are unconstitutional; an impairment is constitutional if it is reasonable and necessary to serve an important public purpose.Id. at 21-26. In that regard, the courts accord a degree of deference to a legislative judgment of reasonableness and necessity. See Baltimore Teachers Union v. Mayor and CityCouncil of Baltimore, 6 F.3d 1012, 1019 n. 10, 1022 (4th
Cir. 1993), cert. denied, 510 U.S. 1141 (1994); Maryland StateTeachers Association, Inc. v. Hughes, 594 F.Supp. 1353, 1360-62
(D.Md. 1984), aff'd, No. 84-2213 (4th Cir. 1985), cert.denied, 475 U.S. 1140 (1986); 68 Opinions of the AttorneyGeneral 366 (1983).
In Hughes, the federal district court applied the analysis outlined above and concluded that State legislation reforming the State pension law did not amount to an unconstitutional impairment of contractual rights. In that case, State employee groups challenged the 1984 Pension Reform Law arguing that it unconstitutionally impaired contract rights conferred by a 1979 pension law. The court assumed, without deciding, that the 1979 law created a contractual right to certain pension benefits.594 F.Supp. at 1362-63. Even under that assumption, the court found that the State retained the power to amend or alter the contract to enhance the actuarial soundness of the plan. Id. The court then turned to the question of impairment. It first concluded that the 1984 law did not deny vested or earned pension rights retroactively and allowed employees to protect pension benefits earned up to the effective date of the law by selecting a particular option from the "menu" offered by the 1984 law. Id.
at 1363-64. Relying on City of Frederick v. Quinn,35 Md.App. 626, 371 A.2d 724 (1977)[15] and a prior opinion of this Office, the court held that "Maryland law would not extend unalterable contract protection against change in pension benefits which were to be earned on a pro rata basis by employment service in the future." Id.
Finally, the court held that, to the extent that the 1984 law did in fact impair any contract right, it was supported by "an important and legitimate public purpose" — i.e., protecting the soundness of the retirement system that had been created by the 1979 legislation. 594 F.Supp. at 1364-70. The court found that the 1984 law was a reasonable and necessary response to problems that had surfaced since 1979. Accordingly, the 1984 law did not violate the Contract Clause of the federal Constitution, regardless of whether it had impaired a contractual obligation of the State. Id. The court deferred to the General Assembly's judgment in determining how best to preserve the stability of the State pension systems. See also 76 Opinions of the AttorneyGeneral 351, 354-56 (1991) (applying analysis described inHughes and concluding that proposed legislation imposing benefits limits in order to allow the pension system to retain tax-qualified status with the IRS did not violate Contract Clause).
3. Whether the Health Benefits Statute Creates a ContractualObligation
As noted above, there is a presumption that statutes do not create contractual rights unless there is a clear legislative intent to do so. The State statute that extends employee health benefits to certain classes of retirees does not expressly create a contractual right. Apart from certain provisions relating to fiscal years 2006 and 2007, it does not purport to promise any particular level of benefits or subsidy to employees. The benefits and subsidy made available to retirees are keyed to those to which current employees are entitled.[16] The statute does not appear to confer any greater right to benefits and a State subsidy to retirees. Nor is there any clear and express language that vests retirees with benefits. We are not aware of any Maryland cases that hold that State retiree health care benefits authorized by statute generally are a contractual right.
Thus, in our view, there is no contractual right to retiree health care benefits that could be impaired if the General Assembly were to amend the statute to change the level of benefits or subsidy or were to continue to leave the extent of benefits to the Secretary's and Governor's discretion.[17]
On the other hand, the General Assembly could confer a contractual right to health care benefits by enacting legislation to that effect, if it chose to do so. However, such a commitment would be subject to modification in the future by the General Assembly under the standards set forth in Hughes and other cases construing the Contract Clause.
B. Case Law in Other States Concerning Retiree Health CareBenefits
You have asked whether there is any case law concerning alteration of retiree health care benefits, particularly in other states whose bonds have received the highest rating from the rating agencies. We are not aware of any case law that construes or applies GASB 45 — which is not surprising, as GASB 45 was only recently issued. Nor are we aware of any case law concerning the alteration of retiree health care benefits in other states whose bonds have been given the highest rating by the bond rating agencies.[18]
Courts in other states have rendered opinions concerning the alteration of health care benefits of retired public employees. Most of those opinions are of limited value in answering the questions you have raised, as they construe state constitutional provisions, statutes, or contracts peculiar to the particular state.
Some courts have looked to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., for guidance. ERISA, which applies to private employers,[19]
distinguishes pension plans from "welfare benefit plans" (defined to include retiree health insurance benefits).29 U.S.C. § 1002(1), 2(a). In particular, it excepts welfare benefit plans from its vesting requirements. 29 U.S.C. § 1051(1). The exclusion of welfare benefit plans from the ERISA vesting requirement has been attributed to the fluctuating and unpredictable nature of the costs of such plans:
 Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs.
Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988). Under ERISA, an employer may voluntarily create a vested right in retiree health care benefits.[20]
In Davis v. Wilson County, 70 S.W.3d 724 (Tenn.S.Ct. 2002), the Tennessee Supreme Court relied on an analogy to ERISA to hold that employees do not automatically have a vested interest in welfare plan benefits — such as retiree health care benefits. Rather there must be "clear and express language" indicating an intent to confer a vested benefit. 70 S.W.3d at 727-28. In the case before it, the court found no evidence of such intent.
Similarly, in Colorado Springs Fire Fighters Ass'n v. City ofColorado Springs, 784 P.2d 766 (Colo.S.Ct. 1989) (en banc), plaintiffs argued that a 1966 municipal ordinance that provided for full payment of retiree health insurance costs amounted to a "contractual, quasi-pension benefit" and that a subsequent ordinance reducing that benefit was an unconstitutional impairment of contract rights. However, in concluding that the program was not a "pension benefit", the Colorado Supreme Court found that the municipal program was similar to a state retiree health benefit program, under which the amount of the health benefit premium subsidy was determined on an annual basis, the cost and design of the program was subject to change, and employee participation was optional. 784 P.2d at 771. The court also drew an analogy to ERISA's exclusion of welfare plan benefits, such as health insurance, from mandatory vesting. Id.
at 772. The court held that the municipal ordinance did not otherwise create an enforceable contract because, among other things, it did not address the level of benefits.
Without making an explicit analogy to ERISA, some courts have looked to the use of elective language in a statute conferring health care benefits and the unpredictable costs of such benefits to conclude that a legislature did not intend a contractual obligation. For example, Bernstein v. Commonwealth, 617 A.2d 55
(Pa.Cmwlth. 1992), involved an interpretation of a Pennsylvania statute that provided for an "election" by retirees of State health care coverage. The case arose after Pennsylvania changed the health care options for its retirees to eliminate coverage duplicative of Medicare Part B. Some retirees challenged this change in benefits, arguing that it amounted to an unconstitutional impairment of their contract rights. The court held that the statutory language merely gave a retiree an option to participate in the employee health coverage. It also concluded that the state legislature, recognizing the practical reality of fluctuating health care costs, had not committed the state to any particular plan. The court noted that the amount of the state share of the costs of the health insurance program had changed over the period that the plaintiffs had been active employees, thus undermining any contention that they had an expectation of a particular level of benefits upon retirement. 617 A.2d at 59-60.But see Thorning v. Hollister School District,15 Cal.Rptr.2d 91, 94-95 (Ct.App. 1993) (although both statute allowing for retiree health care benefits and local policy under that statute were phrased in elective language, retired school board members who had elected those benefits had vested right because elements of compensation for elected officers became contractually vested upon acceptance of employment).
Several states have constitutional provisions that protect the "accrued" benefits of retirees. However, courts have reached differing conclusions about whether health care benefits fall within that category. In Duncan v. Retired Public Employees ofAlaska, Inc., 71 P.3d 882 (Ak. S.Ct. 2003), the Alaska Supreme Court held that health insurance benefits were part of the "accrued benefits" of the state employee retirement systems. Accordingly, they were subject to a state constitutional provision that specifically prohibited the diminishment or impairment of such benefits. However, the court held that the prohibition did not prevent the state from modifying retiree health care benefits so long as the modifications were reasonable and any disadvantageous changes were offset by beneficial changes from a group perspective.[21]
Like Alaska, Michigan also has a provision in its state constitution that protects "accrued financial benefits" of public employees from impairment or diminishment. In Studier v.Michigan Public School Employees' Retirement Board,698 N.W.2d 350 (Mich.S.Ct. 2005), the Michigan Supreme Court held that the phrase did not encompass retiree health care benefits.[22]
In addition, the court also held that the statute creating retiree health care benefits did not establish a contractual obligation and that modification of the prescription drug benefits — increasing co-payments and implementing monetary incentives to encourage the choice of formulary drugs — would not implicate the contract clauses of the state or federal constitutions. Rather, the court found that the Michigan legislature had simply made a policy decision that there would be a subsidy for a retiree who chose to participate in whatever plan the state authorized; the statute did not require that any particular plan be developed or that the plan could not be later amended. Id. at 363-64.
Some court decisions relate to the public collective bargaining law of the particular state, as well as particular collective bargaining contracts. In Poole v. City of Waterbury,831 A.2d 211 (Conn.S.Ct. 2003), a city confronted with a financial crisis entered into a new collective bargaining agreement that replaced a prior indemnity plan for employee and retiree health care benefits with a managed care plan. Retired municipal firefighters challenged that modification, arguing that they had a vested right in the medical benefits provided by the collective bargaining agreement with the city at the time of retirement. In construing ambiguous language in particular collective bargaining contracts, the Connecticut Supreme Court held that, although the plaintiffs had a vested right to retiree medical benefits generally, they did not have a vested right in the particular menu of benefits provided in an expired collective bargaining agreement. 831 A.2d at 231-32. Rather, the court would look to whether the benefits provided to retirees were "reasonably commensurate" with the benefits afforded by an agreement, when viewing the group of retirees as a whole. 831 A.2d at 234. In discussing whether there should be a presumption in favor of vesting of retiree health care benefits, the court contrasted the inability to predict or control health insurance costs with the more predictable nature of pension benefits. Id. at 223. The court also noted that it would be "counter to all of the parties' interests" to construe the collective bargaining agreements to freeze benefits in the exact plan provided at the time of retirement. Id. at 233.
On the other hand, in Roth v. City of Glendale,614 N.W.2d 467 (Wis.S.Ct. 2000), the Wisconsin Supreme Court interpreted a series of limited term collective bargaining agreements between a city and union that included provisions for subsidizing retiree health care benefits and adopted a presumption that such benefits vest unless the language of the contract provided otherwise. The Court treated those benefits as part of the package of retirement benefits that ordinarily last beyond the life of the contract, in the absence of contract language or extrinsic evidence demonstrating a contrary intention. Id. at 471-74.
As this brief summary of case law in other jurisdictions illustrates, there is no consensus in the courts that retiree health care benefits are a vested or contractual right. The cases concerning public employees in other jurisdictions reach various conclusions, depending on the particular constitutional provisions, statutes, or collective bargaining agreements that govern the benefits at issue.
C. Distinction Between Pension Benefits and Health CareBenefits
You have asked whether there are legal distinctions between a retiree's right to pension benefits and to health care benefits. A key distinction is that retirees have a contractual right to pension benefits, but not to health benefits. This distinction is borne out in a number of ways.
Pension statutes refer to membership in the pension system as a "condition of employment." See, e.g., SPP §§ 23-203 (Employees' Pension System), 23-208 (Teachers' Pension System), 22-202(a) (Employees' Retirement System), 22-206(a) (Teachers' Retirement System), 24-202 (State Police Retirement System), 25-202 (Correctional Officers' Retirement System). Citing similar language in a prior version of the State retirement law, Attorney General Sachs concluded that the law created a contractual obligation, although benefits were subject to reasonable modification by the General Assembly for the purpose of maintaining the financial flexibility and integrity of the retirement systems. 68 Opinions of the Attorney General 366 (1983);[23] see also 61 Opinions of the AttorneyGeneral 746, 747-51 (1976) (concluding that earlier version of pension law demonstrated intent to create contractual rights).
The retirement law specifically refers to the "vesting" of pension benefits. See, e.g., SPP § 20-101(tt) (definition of "vested allowance"); § 21-112(2)(ii) (members of retirement systems entitled to annual report showing "vested benefits"); § 22-213 (transfer of vested rights between systems); § 23-501 (continuation of benefits for "former vested members"); §§ 29-302, 29-303 (computation of vested allowance); §§ 29-304, 29-305 (immediate vesting for heads of units and other officials). In addition, the State retirement law explicitly guarantees the payment of retirement allowances and other benefits provided by the pension laws. SPP § 21-302. The statute provides that "the following are obligations of the State":
 (1) the payment of all allowances and other benefits payable under . . . [the State pension laws];
 (2) the creation and maintenance of reserves in the accumulation funds of the several systems;
 (3) the crediting of regular interest to the annuity savings funds of the several systems; and
 (4) the payment of expenses for administration and operation of the several systems.
SPP § 21-302(a).[24]
Maryland courts have adopted the view that government pension plans are contractual in nature, "but under certain circumstances the government may unilaterally modify them so long as any changes do not adversely alter the benefits, or if the benefits are adversely altered, they are replaced with comparable benefits." Davis v. City of Annapolis, 98 Md. App. 707, 715,635 A.2d 36 (1994) (Cathell, J.) (police officer entitled to disability pension benefits under the statute in effect at the time of injury). See also Board of Trustees of Employees'Retirement System v. Mayor and City Council of Baltimore City,317 Md. 72, 100, 562 A.2d 720 (1989), cert. denied,493 U.S. 1093 (1990) ("There is no doubt that, by establishing the pension systems, the City imposed contractual obligations on itself");Quesenberry v. Washington Sububran Sanitary Commission,311 Md. 417, 423, 535 A.2d 481 (1988) (stating that rights conferred by a public pension plan are contractual in nature, although they may be modified by unilateral action of the employer in certain circumstances); City of Frederick v. Quinn, 35 Md.App. 626,629-31, 371 A.2d 724 (1977) (holding that government pensions are "more contractual than gratuitous" and citing a "reserved legislative power" to make reasonable modifications in a pension plan).[25] Courts in other states have also concluded that state and local governments have undertaken contractual obligations in creating pension plans. See 16B Am.Jur.2d,Constitutional Law, § 721.
By contrast, as noted above, retirees do not have a contractual right to health care benefits. SPP § 2-508, in providing retiree health care benefits, neither states that a retiree "vests" in Program or subsidy eligibility, nor characterizes any portion of the Program as an obligation of the State" to retirees. Rather, there is a statutory right, the delineation of which has been largely delegated to the Secretary of DBM and the Governor, and which is subject to change by the General Assembly.
The distinction between pension benefits and health care benefits is also borne out by the method of funding chosen by the Legislature. The State retirement law provides for advance funding of pension benefits with government and employee contributions and creates specific funds for each of the State's retirement systems. SPP § 21-301 et seq. By contrast, with limited exceptions, the funding of the subsidy of benefits in the Program is left to the judgment of the Secretary of DBM and the Governor in devising an amount to include in the proposed budget. SPP § 2-503(a)(3). There is no suggestion that this estimate must satisfy a pre-existing obligation.
It is true that the Legislature has created two special funds to help finance retiree health care benefits in the future. SPP §§ 2-516 (State Employees and Retirees Health and Welfare Benefits Fund); 34-101 (Postretirement Health Benefits Trust Fund). However, the first fund is specifically identified as a "special reserve fund . . . to retain certain State revenues and State general and special funds for the purpose of funding the [Program]." SPP § 2-516(b)(1). This reserve fund would help finance health care benefits of current employees, as well as retirees. The statute establishing the reserve fund does not create any specific obligation to retirees.
In addition, when it created the second fund — the Trust Fund — the Legislature did not commit to provide health care benefits to retirees. The implementing law for the Trust Fund provides that, "if for any reason the State discontinues the postretirement health insurance subsidy specified in [SPP § 2-508], the assets of the [Fund] shall be transferred to the General Fund." SPP § 34-101(i). This provision recognizes the possibility that the subsidy for retiree health care benefits could be eliminated in the future; in that event, retirees would have no special claim on the moneys in the Trust Fund, indicating that the Legislature did not intend to create a contractual obligation to retirees in creating the Trust Fund.
The General Assembly has specifically distinguished health care benefits from pension benefits. The statute that establishes the Program, including health care benefits, states that the Program "may not contain any of the benefits provided under Division II . . ." — i.e., pension benefits. SPP § 2-502(b)(2).
Finally, consistent with the statutory provisions, the materials published to employees and retirees concerning health care benefits have explicitly disclaimed any intention to create a contractual obligation to provide health care benefits. The booklet that summarizes State benefits for employee and retirees prominently states, on its inside cover: "This Book is Not aContract." DBM, Summary of Benefits for Active Retired Employees (July 1, 2005 June 30, 2006). Similarly, the summary of health insurance benefits published by the State Retirement Agency states:
 Membership in the State Health Program does not constitute a contract. The provisions of the program are subject to annual review and modification. Costs may vary each year.
State Retirement Agency, Benefits Handbook for the Employees and Teachers Pension Systems (Rev. July 2004), p. 46; see also id.,
p. 47 (disclaimer paragraph concerning retiree health benefits entitled "This is Not a Contract")
You note that the State subsidy of health care benefits provided to retirees under SPP § 2-508 increases to a certain extent with the length of service of the retiree. You ask whether the relation of the subsidy to length of service results in a contractual obligation. It is true that the statute does not provide all retirees with the same subsidy as current employees, but allocates the amount of the State subsidy to a retiree in relation to some extent to the individual's years of service. In doing so, the statute incorporates the concept of "creditable service" and certain time periods from the pension statutes. However, they are used in SPP § 2-508 to compute a particular retiree's share of whatever subsidy is provided to current employees under the Program, not to set a particular benefit or subsidy level.[26] In our view, this does not change the nature of the benefits provided. As noted above, the statute generally does not establish any particular level of benefits or subsidy and, indeed, contemplates that they will ordinarily depend on annual budget decisions.
In summary, while pension benefits under the State retirement law may be considered a contractual obligation of the State, retiree health care benefits provided through the Program are not. Cf. 78 Opinions of the Attorney General 296 (1993) (distinguishing group health insurance benefits from pension benefits for purposes of the prohibition against in-term increases in "compensation" in Article III, § 35, of the State Constitution).
D. Effect of Collective Bargaining Agreements on Retiree HealthCare Benefits
You have asked whether the State's legal obligations regarding retiree health care benefits can be altered as a result of a collective bargaining agreement between the Administration and employee organizations. The short answer is that a collective bargaining agreement can affect retiree health care benefits, but only if the change is adopted by the General Assembly.[27]
The State collective bargaining law sanctions collective bargaining for many, but not all, employees of the executive branch. SPP § 3-101 et seq. The statute contemplates that representatives of the State will negotiate with the exclusive representatives of various categories of employees. SPP § 3-501. The negotiations are to include "all matters relating to wages, hours, and other terms and conditions of employment." SPP § 3-502. Any agreement resulting from the negotiations is to be incorporated in a memorandum of understanding ("MOU"). An MOU is not effective unless it is ratified by the Governor, as well as a majority of votes cast by employees in the bargaining unit. SPP § 3-601(c); see also Ehrlich v. Maryland State Employees Union,382 Md. 597, 856 A.2d 669 (2004).[28]
The statute contemplates that Governor will include any additional costs resulting from a ratified MOU in the proposed budget for the relevant departments. SPP § 3-501(c)(2)(ii).[29] Pursuant to the State Constitution, the General Assembly remains free to reduce or strike those appropriations when it considers the Governor's proposed budget. Maryland Constitution, Article III, § 52(6). In addition, to the extent that negotiations result in an MOU that has terms inconsistent with current law, those terms become effective only if the General Assembly amends the applicable law. SPP § 3-502(c).
In our view, retiree health care benefits would be encompassed within "wages, hours, and other terms and conditions of employment" and thus can be a subject of collective bargaining under the State collective bargaining law. The Administration could negotiate with employee representatives concerning the types and level of health care benefits to be included in the Program designed by the Secretary for employees and, by operation of SPP § 2-508, certain classes of retirees. However, the costs associated with any such agreement would be subject to reduction or elimination as part of the General Assembly's budget process. In addition, to the extent that the MOU embodied an agreement for retiree health care benefits different from those in current law, the change could not become effective until the General Assembly amended the law.
Thus, a collectively bargained MOU could only change the nature of retiree health care benefits if the General Assembly incorporated that change in the law.[30] As we understand it, none of the collective bargaining MOUs to date between the State and recognized representatives have specifically addressed the subject of retiree health care benefits. To the extent that MOUs have referred to employee health care benefits, they have not deviated from the existing statutory provisions.
E. GASB 45 and the Use of a Trust to Fund Benefits
Finally, you ask several questions related to the creation of a trust to fund retiree health care benefits.
1. Whether GASB 45 Creates Legal Obligations
You ask whether GASB 45 creates any legal obligations for the State to treat retiree health care benefits in the same manner as pension benefits. As noted above, GASB is a private organization that develops accounting standards. It has no authority to impose legal obligations on the State and does not purport to do so. Moreover, GASB 45 itself was not intended to mandate any particular level of benefits or method of financing those benefits. GASB has explained:
 Q — Does Statement 45 require that an employer change its method of financing OPEB . . . to begin paying the ARC or otherwise accumulate plan net assets in order to fund the actuarially accrued benefits in some manner?
 A — No. Statement 45 establishes standards for an employer's accounting and financial reporting of OPEB. The ARC is used in the measurement of . . . OPEB expense . . .
See GASB, Guide to Implementation of GASB Statements 43 and 45on Other Postemployment Benefits, p. 30 (emphasis in original). Accordingly, GASB 45 imposes no legal obligations on the State with respect to the level or types of health care benefits accorded to retirees or the financing of those benefits.[31]
 2. Effect of Creation of Irrevocable Trust
Under GASB 45, assets transferred to an irrevocable trust "or equivalent arrangement" that dedicates those assets to the financing of retiree health care benefits and protects them from the employer's creditors are considered a payment in relation to the employer's ARC. (Other payments in relation to the ARC include funds actually paid for health benefits and premiums paid to an insurer for that year). GASB, Guide to Implementation ofGASB Statements 43 and 45 on Other Postemployment Benefits,
p. 32 (Question and Answer 100).
You asked whether the creation of a non-revocable trust fund in response to GASB 45 would create a legal obligation to provide retiree health care benefits. It is difficult to answer this question in the abstract without the terms of a specific proposal.[32] If the State were to create an irrevocable trust for retiree health care benefits, particularly one that consisted in part of employee contributions, there may be a stronger argument that the State had undertaken a contractual obligation to provide retiree health care benefits — or at least to devote the funds in the trust to that purpose. Cf. 66Opinions of the Attorney General 56 (1981) (statute creating Fair Campaign Financing Fund with voluntary contributions of taxpayers established a trust and a contractual obligation of the State).
 III Conclusion
In summary, it is our opinion that:
1. The State currently has a statutory obligation to provide health care benefits to certain retirees; however, the statute does not create a contractual obligation and the General Assembly remains free to amend the law that provides such benefits. Although the General Assembly may choose to confer a vested right in retiree health care benefits, it has not done so. Even a contractual right to health care benefits would be subject to modification if reasonable and necessary to serve an important public purpose.
2. With respect to other states that, like Maryland, enjoy the highest credit rating from the bond rating agencies, we found no relevant case law. There are cases in other states that have reached various conclusions; some of those decisions recognize a contractual obligation to provide health care benefits to retirees. However, those cases are of limited value in construing Maryland law as they are based on the particular state constitution, statute, collective bargaining agreement, or other circumstances peculiar to the case.
3. In contrast to retiree health care benefits, pension benefits are contractual in nature. The statutes creating the various retirement systems explicitly vest certain rights in retirees with respect to the type and level of benefits, while the statute concerning retiree health care benefits does not. Prior opinions of this Office and court decisions confirm that the pension benefits are a contractual obligation. The fact that the amount of a retiree's subsidy for health care benefits may be related to length of State service does not alter this essential distinction.
4. Collective bargaining negotiations could result in changes in the State's legal obligations concerning retiree health benefits, but only if the General Assembly specifically adopted those changes.
5. GASB 45, as an accounting standard issued by a private entity, does not itself impose any legal obligation on the State concerning the level or funding of retiree health care benefits. Nor does it express a preference for or prescribe the timing or the method of financing retiree health care benefits. The creation of an irrevocable trust to fund retiree health care benefits could be part of a contractual undertaking of the State to provide those benefits. If the trust fund consisted in part of employee contributions, there may be a stronger argument that the State had undertaken to devote the funds in the trust to retiree health care benefits.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Bonnie A. Kirkland Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] The Advisory Council is to advise the Secretary concerning:
 (1) health insurance benefit options that should be included in the Program;
 (2) types of health care providers that should be used to provide health insurance benefits under the Program;
 (3) procedures for soliciting bids or requesting proposals from health care providers for contracts for the Program;
 (4) the implementation, maintenance, and administration of the health insurance benefits under the Program; and
 (5) negotiations involving health insurance benefits under the Program.
SPP § 2-506(a).
[2] Separate sections of the statute set forth the eligibility standards and benefits for employees of institutions of higher education who retire under the optional retirement program (SPP § 2-509), retired Baltimore City jail employees (SPP § 2-510), employees and retirees of the Maryland Environmental Service and Northeast Maryland Waste Disposal Authority (SPP § 2-511), employees of certain not-for-profit organizations (SPP § 2-512), county and municipal employees (SPP § 2-513), and employees of regional economic development councils (SPP § 2-515).
[3] The federal legislation also provided for a federal subsidy of employers who continue to provide prescription drug coverage for retirees. 42 U.S.C. § 1395w-132; see also Fiscal and Policy Note for Senate Bill 614 (March 15, 2004). The federal subsidy is designed to encourage group health plans to provide retiree prescription drug coverage that is at least actuarially equivalent to Medicare Part D. See Joint Committee on Pensions, 2004 Interim Report, Report on the State's Unfunded RetireeHealthare Liability, p. 184; see also Fiscal and Policy Note (Revised) for Senate Bill 548 (March 30, 2004).
[4] The statute places the following limitations on changes in benefits for fiscal year 2006 and 2007:
 (2) In fiscal years 2006 and 2007:
 (i) the employee or retiree share of the premium for the employee or retiree and their dependents for the point of service health plan may increase to 17%;
 (ii) the Program may include disease management programs;
 (iii) the Prescription Drug Benefit Plan shall offer a voluntary mail order option and the Prescription Drug Benefit Plan may charge enrollees the following co-payments for prescription drugs:
 1. $5 for generic drugs;
 2. $15 for preferred drugs on the State formulary; and
 3. $25 for drugs that are not preferred drugs on the State formulary;
 (iv) the Prescription Drug Benefit Plan may charge a co-payment as provided in item (iii) of this subsection for each 45-day prescription;
 (v) for each fiscal year, the total amount of co-payments charged the employee or retiree and their dependents as provided in item (iii) of this subsection may not exceed $700; and
 (vi) the Prescription Drug Benefit Plan may include the following programmatic changes:
 1. implementation of a step therapy program to assure that lower cost alternatives are used first;
 2. changes in the pharmacy network;
 3. limitations on the first prescription for a maintenance drug;
 4. limitations on the quantity of drugs dispensed to reduce inappropriate or excessive drug usage;
 5. requirements for prior authorization of drugs to ensure that they are medically necessary; and
 6. implementation of a drug utilization review program.
SPP § 2-502(c)(2). With respect to fiscal year 2006, these provisions would be regarded as directory, rather than mandatory.See Letter of Attorney General J. Joseph Curran, Jr., to Governor Robert L. Ehrlich, Jr., concerning House Bill 147 (May 19, 2005) p. 4 n. 4.
[5] Any subsidies received after fiscal year 2007 are to be deposited in the Postretirement Health Benefits Trust Fund. See
Part I.B.2 below.
[6] In some cases, such benefits are also available to the spouse and dependent children of deceased retirees. SPP § 2-508(b)(2).
[7] "Creditable service" is specifically defined in the statute. SPP § 2-508(a)(2).
[8] This subsidy is not specifically authorized in the language of SPP § 2-508 itself, which sets out a pro-rated subsidy based on years of service. The regulation apparently reflects the agency's understanding of legislative intent. Prior to the enactment of the predecessor of SPP § 2-508 in 1984, there was a "custom" of providing retirees with subsidized health care benefits equivalent to those of active employees, although the custom was not reflected in statute. The Joint Legislative and Executive Committee on Pensions recommended, among other things, that employees who retired prior to July 1, 1984, be grandfathered under that custom. Report of the Joint Legislative and Executive Committee on Pensions (January 1984), pp. 37-40. The legislation that emanated from that report — the predecessor of SPP § 2-508 — was explicitly intended to incorporate the Joint Committee's recommendations. See Chapter 290, Preamble, Laws of Maryland 1984. The language of the statute that was enacted failed to explicitly reflect that intent with respect to the grandfathering of those who retired prior to July 1, 1984. However, the understanding that those retirees were grandfathered under the prior practice was described in a memorandum of the Secretary of Personnel to all State employees shortly after the 1984 bill was enacted. Memorandum of Theodore E. Thornton, Sr., Secretary of Personnel, to All State Employees (May 15, 1984).
[9] This subsidy was originally provided by statute. See
Chapter 745, Laws of Maryland 1985, then codified at
Article 64A, § 48B(c)(2)(ii). However, the reference to the subsidy was apparently inadvertently dropped from the statute during code revision. Chapter 10, § 2, Laws of Maryland 1993.
[10] The amount transferred each year is to equal the lesser of: (1) one-quarter of the Trust Fund's investment gains for the prior year; and (2) the annual cost of the retiree health care benefits provided under SPP § 2-508.
[11] The American Institute of Certified Public Accountants requires auditors to note non-compliance with GASB standards when an auditor expresses an opinion on whether an entity's financial reports are presented in accordance with generally accepted accounting principles ("GAAP"). AICPA, Rules of Professional Conduct, §§ 203, 203-2.
[12] GASB 45 is being phased in, beginning with the largest governments, and is effective for the fiscal year beginning after December 15, 2006 for governments with annual revenues in excess of $100,000,000. GASB, Summary of Statement 45 (June 2004).
[13] To some extent these constraints are directory rather than mandatory. See footnote 4 above.
[14] Under certain conditions, the General Assembly may mandate the inclusion of a particular expenditure in the State budget. Maryland Constitution, Article III, § 52(11). The Legislature has generally not exercised this authority in establishing a subsidy for employee and retiree health care benefits, presumably to allow the Secretary flexibility in responding to the evolving market for health care benefits.
[15] In Quinn, the Court of Special Appeals held that, even though municipal employees had vested rights in a pension plan, those rights were subject to the power of the city to make reasonable and necessary modifications.
[16] It is also notable that the statute states that a retiree "may enroll and participate" in the Program — clearly indicating that the retiree has a choice. By contrast, employees are automatically enrolled in pension programs. See Part II.C. of this opinion, below.
[17] Nor do we believe that modification of SPP § 2-508 would affect a property interest or vested right protected by the Due Process Clause of the federal Constitution or Articles 19 and 24 of the Maryland Declaration of Rights. See Flemming v. Nestor,363 U.S. 603, 610 (1960) ("To engraft upon the Social Security system a concept of `accrued property rights' would deprive it of the flexibility and boldness in adjustment to everchanging conditions which it demands.").
[18] We understand that the other states, in addition to Maryland, whose bonds have achieved the top rating from all of the major rating agencies are: Delaware, Georgia, Missouri, Utah, and Virginia.
One case in Georgia held that a life insurance benefit provided to retirees was not vested. Wilson v. City of East Point,360 S.E.2d 254 (Ga.S.Ct. 1987). However, that case involved construction of a municipal ordinance that explicitly limited the benefit "for such time as may be determined by the City Council."
[19] ERISA does not apply to government retirement and benefit plans. 29 U.S.C. § 1003(b).
[20] There is some variation in the cases as to how explicitly that intent must be expressed. See Poole v. City of Waterbury,831 A.2d 211, 221-22 (Conn.S.Ct. 2003).
[21] The court rejected the plaintiff's argument that the issue of impairment should be measured from the perspective of an individual employee. 71 P.3d at 889.
[22] In concluding that retiree health care benefits were not "accrued financial benefits" for purposes of the Michigan constitution, the court noted that, unlike pension benefits, the amount of health care benefits did not increase with the retiree's years of service and therefore "they are not accrued."698 N.W.2d at 358. It also reasoned that health care benefits are not "financial" benefits as they do not consist of monetary payments. Id.
[23] Attorney General Sachs' opinion anticipated the Legislature's subsequent enactment of pension reform legislation in 1984 and the federal district court's decision upholding that legislation against a Contract Clause challenge. See MarylandState Teachers Ass'n, Inc v. Hughes, supra.
[24] The statute further specifies that the assets of the pension systems are to be used to pay these obligations and that the State is to make up any amount each year in the accumulation fund of each system necessary to pay allowances and other benefits out of the fund for the year. SPP § 213-02(b)-(c).
[25] In Quinn, Judge Lowe summarized the circumstances under which a government pension plan could be altered:
 Each case where a changed plan is substituted must be analyzed on its record to determine whether the change was reasonably intended to preserve the integrity of the pension system by enhancing its actuarial soundness, as a reasonable change promoting a paramount interest of the State without serious detriment to the employee. In short, the employee must have available substantially the plan he bargained for and diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare.
35 Md. App. at 631.
[26] Even in a state with a constitutional provision protecting "accrued" financial benefits, this factor would not be conclusive on whether health care benefits fall within that phrase. See
note 22 above.
[27] We address only retiree health care benefits that were the subject of the recent actuarial valuation study and that may be affected by agreements under the State's collective bargaining law. We do not address retiree health care benefits that may be provided under other collective bargaining regimes, such as agreements between the Maryland Transit Administration and its employees. See Annotated Code of Maryland, Transportation Article, § 7-601 et seq.
[28] In the case of an institution of higher education, the MOU must be ratified by the institution's governing board, as well as a majority of employees in the bargaining unit. SPP § 36-01(c)(2).
[29] The statute states:
 In the budget bill submitted to the General Assembly, the Governor shall include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations, including the actuarial impact of any legislative changes to any of the State pension or retirement systems that are required . . .
SPP § 3-501(c)(2)(ii).
[30] There is case law in other states holding that promises made in a collective bargaining agreement may confer a vested right to retiree health care benefits. See Poole v. City ofWaterbury, 831 A.2d 211, 222 n. 10 (Conn.S.Ct. 2003) (collecting cases); see also Minnesota Op. Atty. Gen. 125A-28,2001 WL 505668 (2001) (provision of state statute governing collective bargaining limited duration of promise of retiree health care benefits to term of agreement; however, promise of lifetime coverage made in collective bargaining agreement prior to enactment of that provision remained in effect).
[31] This does not mean that GASB 45 may not have a significant impact on states and their finances. States will likely feel compelled to comply with the accounting and disclosure standards established in GASB 45. To the extent that compliance with GASB 45 results in a large liability being added to a state's balance sheet, the state may try to reduce that liability in various ways to avoid adverse action by bond-rating agencies. See Solomon,State, Local Officials Face Looming Health-Care Tab, Wall Street Journal (November 23, 2005), p.A1; Fitch Ratings, The NotSo Golden Years — Credit Implications of GASB 45 (June 22, 2005), p. 2.
[32] As outlined above, the General Assembly has created the Postretirement Health Benefits Trust Fund to help finance retiree health care benefits in the future. However, that Trust Fund is not irrevocable, as its implementing law contemplates a possible termination of benefits and reversion of funds to the general fund.
 *Page 3